PETER NAVARRO, *pro se*
801 Pennsylvania Ave, Unit 1021
Washington, DC, 20004
202-489-7479
pknavarro@protonmail.com

Jury Trial Requested

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PETER NAVARRO,
801 Pennsylvania Ave, Unit 1021
Washington, DC, 20004
pknavarro@protonmail.com

      *Plaintiff,*

    v.

Case: 1:22-cv-01519
Assigned To : Moss, Randolph D.
Assign. Date : 5/31/2022
Description: Pro Se Gen. Civ. (F-DECK)

NANCY PELOSI, in her official
capacity as Speaker of the United States
House of Representatives; 1236 Longworth HOB
Washington DC 20515 Jury Trial Requested

BENNIE G. THOMPSON, in his official
capacity as Chair of the Select Committee
to Investigate the January 6th Attack on the
United States Capitol; 2466 Rayburn HOB
Washington DC 20515

ELIZABETH L. CHENEY, in her official
capacity as a member of the United States
House of Representatives; 416 Cannon House Office Bldg
Washington DC 20515

ADAM B. SCHIFF, in his official
capacity as a member of the United States
House of Representatives;
2309 Rayburn HOB
Washington DC 20515

RECEIVED

MAY 3 1 2022

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

JAMIE B. RASKIN, in his official
capacity as a member of the United States
House of Representatives;
*2242 Rayburn HOB*
*Washington DC 20515*

SUSAN E. LOFGREN, in her official
capacity as a member of the United States
House of Representatives; *1401 Longworth HOB*
*Washington DC 20515*

ELAINE G. LURIA, in her official
capacity as a member of the United States
House of Representatives; *412 Cannon HOB*
*Washington DC 20515*

PETER R. AGUILAR, in his official
capacity as a member of the United States
House of Representatives; *109 Cannon HOB*
*Washington DC 20515*

STEPHANIE MURPHY, in her official
capacity as a member of the United States
House of Representatives; *1710 Longworth HOB*
*Washington DC 20515*

ADAM D. KINZINGER, in his official
capacity as a member of the United States
House of Representatives; *2245 Rayburn HOB*
*Washington DC 20515*

HOUSE SELECT COMMITTEE TO
INVESTIGATE THE JANUARY 6TH
ATTACK ON THE UNITED STATES
CAPITOL; *Longworth HOB*
*Washington DC 20515*

UNITED STATES HOUSE OF
REPRESENTATIVES; and *Office of General Counsel*
*5140 O'Neill HOB*
*Washington DC 20515*

MATTHEW M. GRAVES  in his
official capacity as United States Attorney
for the District of Columbia. *US Attorney and*
*Patrick Henry pld*
*4y1 D St NW DC 20530*
*Washington*

                    *Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## PRELIMINARY STATEMENT

1.      I, the Plaintiff, Dr. Peter Navarro, am a private citizen who previously served as a senior White House advisor during the four years of Donald John Trump's presidency.  I bring this complaint *pro se*, request a jury trial, and seek declaratory and injunctive relief to: (1) declare that the House Select Committee To Investigate the January 6th Attack on the United States Capital (Committee) is neither duly authorized nor properly constituted and therefore its legislative acts, including its subpoena issued to me and Committee Report 117-284 of the 2nd session of the 117th Congress are therefore ultra vires, unlawful, and unenforceable; (2)  declare that the Committee's subpoena, the Committee's Report 117-284, and House Resolution 1037 117th Congress (2021-2022) all represent legislative acts that violate the principle of separation of powers in their unlawful simultaneous pursuit of a judicial function under the flag, and behind the shield, of a facially valid legislative function and are therefore ultra vires, unlawful, and unenforceable; (3) declare that the Committee's subpoena, the Committee's Report 117-284, and H.Res. 1037 violate the constitutional proscription against bills of attainder and are therefore ultra vires, unlawful, and unenforceable; (4) declare that the subpoena issued to me improperly compels testimony of a senior executive official; (5) enjoin the U.S. Attorney for the District of Columbia from proceeding against me "in the manner and form provided by law" as  H.Res. 1037 recommends; (6) enjoin the U.S. Attorney for the District of Columbia from enforcing Grand Jury Subpoena #GJ2022052590979 USAO #2022R00631 dated May 26, 2022 which is derivative of the fruit of the poison tree *ultra vires,* illegal, and unenforceable Committee subpoena dated February 9, 2022; and (7) declare that President Joe Biden does not have the

legal authority to waive the executive privilege or testimonial immunity invoked by his predecessor in this civil case.

2.     Duly authorized congressional committees have subpoena authority implied by Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). The Committee is not, however, a duly authorized or properly constituted congressional committee because it fails to comport with House Resolution 8 117th Congress (2021)[1] and with its own authorizing resolution, House Resolution 503 117th Cong. Therefore, the subpoena it has issued to me is invalid and unenforceable.

3.     For a Congressional Committee to duly issue valid and enforceable subpoenas during an investigation — and by extension, seek criminal contempt charges against those who fail to comply with such subpoenas — that investigation must have a valid "legislative function."[2] The *Comm. On Ways & Means v. U.S. Dep't of Treasury* notes that "[a] long line of Supreme Court cases requires great deference to <u>facially valid</u> congressional inquiries." *Comm. On Ways & Means v. U.S. Dep't of Treasury*, 1:19-cv-01974 (TNM), at *1 (D.D.C. Dec. 14, 2021). [emphasis added][3]

4.     *United States v. Brown* makes clear that "[l]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." *United States v. Brown, 381 U.S. 437, 448 (1965).* The Committee's subpoena and the Committee's Report to Congress 117-284 recommending that I be held in contempt of Congress along with H. Res. 1037 all represent "legislative acts."

5.     While the unwillingness of the courts to look beyond "facially valid" congressional investigations may have been correct law within the context of the balance of

power within the three branches of government in prior times, over time, the setting of this low "facially valid" bar has been an open invitation for legislators to simultaneously pursue an unconstitutional judicial function under the false flag, and behind the shield of, their legislative function.   It should be clear here that a pursuit of a facially valid legislative function does not preclude the unconstitutional and unlawful simultaneous pursuit of judicial function.

6.     The result of the courts' silence in this matter is now clear: Repeated abuses by Congress in using its investigatory powers to simultaneously serve both facially valid legislative and unconstitutional judicial functions have institutionalized a partisan weaponization of Congress' investigatory powers that now threatens the delicate balance of powers – and the separation thereof — between the legislative, judicial, and executive branches of our government.   In this case, the legislative history of the Committee and its members broadly viewed over a more than five-year period reveals an undeniable and overwhelming pattern of the weaponization of Congress' investigatory powers to pursue a judicial, and by implication, a political function.

7.     In this case, the legislative acts of the Committee and its members together with H.Res 1037 constitute an unlawful exercise of the judicial function over and above the Committee's "facially valid" legislative function, thereby violate the principle of the separation of powers, and cannot advance a legal contempt of Congress charge against me through the United States Attorney's office.

8.     The Committee's subpoena, the Committee's Report 117-284, and H.Res. 1037 constitute legislative acts that violate the constitutional proscription against bills of attainder, and each should be invalidated and declared unenforceable.   These legislative acts violate the Constitutional proscription against bills of attainder because: (1) they seek to determine guilt

and inflict punishment on me in the forms of shame, humiliation, banishment, ostracization, incitement of public hate, possible imprisonment, and the confiscation of my property, all without adequate provision of the protections of a judicial trial, and (2) the Committee, contrary to the court's guidance, failed to pursue less burdensome alternatives to achieve its alleged "legitimate nonpunitive objectives." *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977). The set of deprivations which the Committee and its members and which the Democrat-controlled House have inflicted and seek to inflict on me are "so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably … fall within the proscription of Art. I, § 9. *Nixon v. Administrator of General Services*, 433 U.S. 425, 473 (1977). At my age of seventy-two, with the average life expectancy in America for males at seventy-six, a one-year prison term would constitute over 25% of my remaining expected life while a $100,000 fine would be equivalent to a significant fraction of my wealth for retirement.

9.      Rather than pursuing the less burdensome alternatives of negotiating a waiver of executive privilege and testimonial immunity from President Trump and his attorneys or a civil suit as *Nixon v. Administrator of General Services* and *Committee on Judiciary v. Miers* guides, the Committee and Congress with its passage of H.Res. 1037 have pursued the most burdensome and punitive alternative with a potential criminal prosecution in their naked effort to threaten and coerce me into turning my back on my duty to my country and appearing before their kangaroo court. By the Committee's refusal to negotiate directly with President Trump and his attorneys on the issue of executive privilege and testimonial immunity – the least burdensome alternative – and by failing to pursue the second least burdensome alternative of a civil suit, my due process has been violated, the legislative acts of the Committee and House of Representatives against me have been exposed as bills of attainder, and these legislative acts of

the Committee and Congress in this case must be invalidated. *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977).  *Committee on Judiciary v. Miers, 558 F. Supp. 2d 53, 76-77 (D.D.C. 2008).*

10.    There is no settled law to support the absurd, fanciful, and extremely dangerous proposition that an incumbent president can waive the executive privilege invoked by his predecessor or waive the testimonial immunity of the senior advisers serving under that predecessor.

11.    Executive privilege is an institution dating back to the days of George Washington that has been deemed critical to effective presidential decision-making; executive privilege, together with testimonial immunity for senior White House advisers provide necessary shields to foster the kind of candor that must exist among the president and his most senior advisors to promote the most effective presidential and executive branch decision-making possible.

12.    I have been put in the untenable position of choosing between conflicting privilege claims that are of constitutional origin and dimension for which there is no settled law.  Allowing a sitting president of one political party to strip a predecessor of another political party of executive privilege and likewise strip senior White House advisors serving that predecessor of their testimonial immunity – regardless of whether this is done under the false flag of the national interest – represents the most extreme and dangerous form of qualifying the privilege and the testimonial immunity. If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would turn deal a mortal blow to the critical functions that executive privilege and testimonial immunity are supposed to serve in our Republic. These functions are to: (1) help ensure the separation of powers; and (2) provide for optimum candor in presidential decision-making.  Any settled law that institutionalizes a

revolving partisan door for the waiving of testimonial immunity and executive privilege will end both immunity and privilege as essential elements of effective presidential decision-making.

13.     The Committee's members along with House Speaker Nancy Pelosi over a more than five year period have been engaged in a "repeatable strategic game" of "gotcha" and punishment that threatens to reduce the institutions of executive privilege and testimonial immunity to ping pong balls of partisan politics.  In this strategic ping pong game, whichever party controls both the House of Representatives and White House will effectively weaponize Congress's investigatory powers in ways designed to: (1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office or serve in government.

14.     The time is ripe for the court to address this controversy and the question of whether an incumbent president can strip his predecessor of executive privilege and testimonial immunity.  Here, if the Committee and Joe Biden manage to pull this deadly game off now and effectively establish the principle in settled law that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024.

15.     Congress cannot lawfully hold me in contempt of Congress for failure to comply with a subpoena that compels me to testify before the Committee because, under long-standing Department of Justice Office of Legal Counsel (OLC) policy, I have absolute testimonial immunity as a senior White House official. As OLC notes: "Since the 1970s, this Office has consistently advised that 'the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee' on matters related to their official duties'" and "[t]he President and his immediate advisers-that is, those who customarily meet with the President on a regular or frequent basis-should be deemed absolutely immune from

testimonial compulsion by a congressional committee.' Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations." Memorandum For Pat A. Cipollone Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.

16.   If the testimonial immunity of senior White House officials is absolute as decades of OLC opinions have deemed it, I thereby have a duty to my country to fail to comply with said Committee subpoena and cannot be held in contempt for this failure to comply; and I have no other choice but to follow the OLC and Counsel's opinion.

17.   If testimonial immunity exists as an institution to provide for unconstrained candor in communications between an adviser and the president or other advisers, as set forth in Counsel Pat A. Cipollone's memo, then it can't be waived by the adviser and certainly not by an incumbent president under which the adviser did not serve.  Only the courts have the power to waive such absolute testimonial immunity on a case-by-case basis and, given the high stakes for the Republic involved, the courts should tread extremely lightly.  If the purpose of testimonial immunity is to provide the confidence senior White House advisers need to speak in complete candor to the president and other senior advisers and thereby promote the most efficient and effective presidential decision-making, then any erosion of such testimonial immunity protection must inevitably lead to a reduction in such candor and therefore less optimal decisions.

18.   On May 26, 2022, two FBI special agents banged loudly on my door in the early morning hours to present me with a fruit of the poisonous tree Grand Jury Subpoena #GJ2022052590979 USAO #2022R00631 commanding me to comply with the original *ultra vires,* illegal and unenforceable subpoena issued to me by the Committee dated February 9,

2022. Specifically, this Grand Jury Subpoena from Matthew M. Graves, the U.S. Attorney for the District of Columbia pointedly ignored all claims of executive privilege and testimonial immunity while commanding me to testify before Grand Jury #22-3 of the U.S. District Court for the District of Columbia on June 2, 2022 and present "[a]ll documents relating to the subpoena dated February 9, 2022" that I "received from the House Select Committee to investigate the January 6, 2021, attack on the US Capitol, including but not limited to any communications with formal President Trump and/or his counsel or representative." [emphasis added]

19.    As demonstrated in this brief, the Committee's original subpoena cited by the U.S. Attorney is indeed *ultra vires*, unlawful, and unenforceable because: (1) the Committee is neither duly authorized nor properly constituted; (2) the Committee's subpoena together with the Committee's Report 117-284, and H.Res. 1037 all represent legislative acts that violate the principle of separation of powers in their simultaneous and unlawful pursuit of a judicial function over and above a facially valid legislative function; (3) the Committee's legislative acts against me, including its subpoena, violate the constitutional proscription against bills of attainder; and (4) both executive privilege and testimonial apply.

20.    The U.S. Attorney cannot issue a Grand Jury Subpoena deemed to be lawful and enforceable that is derivative of a fruit of the poisonous tree *ultra vires,* unlawful, and unenforceable subpoena issued by the Committee and the equally poisonous trees of the Committee's Report 117-284, and H.Res. 1037.

21.    Since the subpoena of the Committee is *ultra vires*, unlawful, and unenforceable, the U.S. Attorney's Grand Jury Subpoena is likewise *ultra vires*, unlawful, and unenforceable and the U.S. Attorney must be enjoined from any actions to enforce this subpoena.

22.    As demonstrated in this brief, the executive privilege invoked by President Trump

is not mine or Joe Biden's to waive. Rather, as with the Committee, the U.S. Attorney has constitutional and due process obligations to negotiate my appearance before Grand Jury #22-3 not with me but rather with President Trump and his attorneys and I am bound by privilege to fail to comply with this Grand Jury Subpoena absent these negotiations and guidance from President Trump.

23.    I come to this case far exceeding ""the irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992). I will demonstrate substantial injury through punishment from Speaker Pelosi, the Committee, and Democrat-controlled House of Representatives responsible for passage of H.Res. 1037 along with possible imminent, existential injury through punishment and the threat of punishment from the U.S. Attorney of the District of Columbia. Only a set of favorable rulings by this court will clearly redress these injuries and prevent further injury.

## PARTIES

1.    Plaintiff Peter Navarro served as a senior White House adviser during all four years of the Trump administration.

2.    Defendant Nancy Pelosi ("Speaker Pelosi") is a Democrat member of the U.S. House of Representatives and Speaker of the House.

3.    Defendant Bennie G. Thompson ("Chairman Thompson") is a Democrat member of the U.S. House of Representatives and Chairman of the Committee to Investigate the January 6th Attack on the United States Capitol. Subpoenas challenged herein were issued with his authority as Chair. Thompson also introduced H. Res. 1037 – 117th Congress (2021-2022) with zero cosponsors.

4.    Defendant Elizabeth L. Cheney is a Republican member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the

United States Capitol.

5.      Defendant Adam B. Schiff is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

6.      Defendant Jamie B. Raskin is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

7.      Defendant Susan E. Lofgren is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

8.      Defendant Elaine G. Luria is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

9.      Defendant Peter R. Aguilar is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

10.      Defendant Stephanie Murphy is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

11.      Defendant Adam D. Kinzinger is a Republican member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

12.      Defendant Select Committee to Investigate the January 6th Attack on the United

States Capitol ("Committee") was created by House Resolution 503 ("H. Res. 503") passed by the U.S. House of Representatives on June 30, 2021.

13.      Defendant House of Representatives passed H. Res. 1037 by the yeas and nays 220-203 along party lines (with two Republican votes) on April 6, 2022.

14.      Defendant Mathew Graves is U.S. Attorney for the District of Columbia who served me with a subpoena (based on an *ultra vires*, unlawful, and unenforceable fruit of the poisonous tree subpoena issued by the Committee) to appear before Grand Jury #22-3 of the U.S. District Court for the District of Columbia.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States.

2.      This Court has personal jurisdiction over Speaker Pelosi because she sponsored H. Res. 503 and oversaw its passage in the House.

3.      This Court has personal jurisdiction over Chairman Thompson because he presides over the Committee and introduced H. Res. 1037.

4.      This court has personal jurisdiction over Elizabeth L. Cheney, Adam B. Schiff, Jamie B. Raskin, Susan E. Lofgren, Elaine G. Luria, Peter R. Aguilar, Stephanie Murphy, Adam D. Kinzinger because they serve as members of the Committee that issued the Navarro subpoena from Washington, D.C.

5.      This Court has personal jurisdiction over the Committee because it is located and operates in Washington, D.C.

6.      Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events

giving rise to the claim occurred in Washington, DC.

## RELEVANT FACTS

1.      On August 3, 2020, the Democrat-funded Transition Integrity Project publicly released a detailed plan to skew the 2020 presidential election in favor of Joe Biden using a combination of lawfare and grassroots tactics. Their overarching purpose was to stuff the ballot box in key battleground states with absentee ballots, many of which would, under the lax, and often illegal, rules they sought to impose, would be illegal votes, and therefore unlawful to count.[4]

2.      In a *Time* magazine cover story, journalist Molly Ball published an article after the election entitled "The Secret History of the Shadow Campaign That Saved the 2020 Election" which confirmed many of the strategies and tactics the Democrats had used to tilt the election in favor of Joe Biden as had been set forth in the TIP plan. Notes Ball: "Their work touched every aspect of the election. They got states to change voting systems and laws and helped secure hundreds of millions in public and private funding."[5]

3.      In the wake of the November 3, 2020 election, numerous analyses emerged revealing the elaborate strategies and tactics the Democrats had indeed used to skew the election and that the Transition Integrity Project had foreshadowed.  This set of analyses included the Plaintiff's "Navarro Report;"[6] and as noted in that report:

> On January 13, 2021, the Democrat-controlled House of Representatives passed
> House Resolution 24 "impeaching Donald John Trump, President of the United
> States, for high crimes and misdemeanors."  A primary justification for this
> overwhelmingly partisan impeachment is that "President Trump repeatedly
> issued false statements asserting that the Presidential election results were the

*product of widespread fraud and should not be accepted by the American people or certified by State or Federal officials."*

*If it can be demonstrated that President Trump had a good faith belief that the November 3, 2020 Presidential election results were, indeed, the poisonous fruit of widespread fraud and election irregularities, POTUS45 must not only be found Not Guilty. The U.S. Senate must also call for a prompt investigation of these alleged irregularities.*

*The three volumes of the Navarro Report provide just such a demonstration. These three volumes have been consolidated herein into a single document explicitly designed as a useful evidentiary handbook and reference guide for the upcoming Senate impeachment trial.*

*Evidence used in the preparation of the Navarro Report includes more than 50 lawsuits and judicial rulings, thousands of affidavits and declarations, testimony in a variety of state venues, published analyses by think tanks and legal centers, videos and photos, public comments, and extensive press coverage.*

*Volume One finds significant election irregularities across six key battleground states – Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin. These irregularities range from outright voter fraud, ballot mishandling, and contestable process fouls to Equal Protection Clause violations, voting machine irregularities, and significant statistical anomalies.*

*Volume Two examines a two-pronged Grand "Stuff the Ballot Box" Strategy used by the Democrat Party and its political operatives to flood the battleground states with enough illegal absentee and mail-in ballots to turn a decisive Trump victory into a narrow, and arguably illegitimate, Biden "win." To strategically game the Presidential election, the Democrats and their operatives were found to have at times bent or broken both election rules and laws.*

*Volume Three provides the most up-to-date statistical "receipts" with respect to the potential number of illegal votes cast in each battleground state. Volume III*

*thereby provides investigators with a well-documented tally of potentially illegal votes on a state-by-state and category-by- category basis. A key finding is that the number of potentially illegal votes dwarfs the very thin alleged Biden "victory" margins across all six battleground states.*

4.      Public opinion polls today indicate that a significant fraction of the American electorate believes the 2020 presidential election was rigged or stolen.[7]

5.      There is no definitive proof offered by the Committee or available in the public square that the November 3, 2020 presidential election was a fair election unmarred by election irregularities.

6.      In the Committee's letter of February 9, 2022 transmitting a subpoena electronically to me, the Committee accuses me of making "many claims of fraud in the election" but also insists that these claims have been discredited by "public reporting, by state officials, and courts."[8] Yet, the only "proof" the Committee's Chair Bennie Thompson offers is a laughable footnote citing an article in the long-discredited Forbes magazine – Forbes is owned by Chinese investors and has been turned largely into a propaganda organ for the Chinese Communist Party.[9]

7.      On January 6, 2020, a large group of Trump supporters gathered in Washington in the American tradition of peaceful protest to support the president in his peaceful bid to get a legal counting of the vote. At this point in time, President Trump had a strong presumption that the election was likely rigged and stolen from him based on the data and analyses available to him, including the "Navarro Report."

8.      Among a large crowd of Trump supporters, there were small pockets of extremists likely seeking to instigate violence that could be blamed on President Trump. These extremists ranged from members of the Marxist group Black Lives Matter and the anarchist Antifa group

to far right militia groups.[10]

9.      There is likewise evidence that among the crowd were individuals serving as informants to the FBI who may have possibly instigated the violence.[11]

10.      The Committee was formed against the backdrop of this January 6 history. In justifying its investigation, the Committee and its members refer repeatedly to the role of President Trump and his advisors, including the Plaintiff, in instigating an unlawful insurrection and promoting an unlawful attempt to overturn the 2020 election while insisting that the election was fair – again, despite no definitive evidence proving the election was fair.[12]

11.      For the four years of the Trump administration, I, the Plaintiff, served as a senior White House adviser to President Donald J. Trump.  While I would carry several titles during my term of service – Director of the National Trade Council, Director of the Office of Trade and Manufacturing Policy, Defense Production Act Policy Coordinator -- my duties and responsibilities in the White House as an Assistant to the President during the relevant times here spanned a far broader spectrum of economic, trade, border security, and national security issues.

12.      During my service, President Trump would regularly seek my candid advice on matters that might seem far outside my "official" duties; and a narrow construction of my role in the White House as the Committee has done based merely on my titles fundamentally misunderstands how the Trump White House worked.

13.      In the aftermath of the November 3rd, 2020 election, I began an investigation that would quickly lead to deep national and economic security concerns about election integrity.  In a series of previously referenced analyses titled collectively "The Navarro Report," I identified not just an abundance of fraud and election irregularities.  I exposed how the Democrat Party

and its operatives effectively made what should have been a landslide win by President Trump into an election close enough to steal.

14.    Given the economic and national security ramifications of a possibly stolen election, I worked diligently in my official capacity as a government official within the White House and as a senior White House adviser to help the president and other senior advisers navigate what appeared to me to be the most sophisticated assault on American democracy ever perpetrated.

15.    In the days leading up to January 6, and as reported in my book *In Trump Time: My Journal of America's Plague Year* referenced by the Committee,[13] I described a legal and constitutional strategy called the Green Bay Sweep which sought to leverage Vice President Mike Pence's constitutional power under the Electoral Count Act of 1887.[14]  The goal was to delay certification of the election for at least another several weeks "while Congress and the various state legislatures involved investigate[d] all of the fraud and election irregularities" that would be raised that day on Capitol Hill.

16.    As noted in *In Trump Time,* the goal of this strategy was "*not* to get the election overturned" as the Committee would insist. Rather, the goal was "to subject the ballots – the *legal* votes of American citizens along what we believed to be a flood of ballots – to careful scrutiny and investigation."

17.    Finally, as noted in *In Trump Time,* because implementation of the Green Bay Sweep strategy required "only peace and calm on Capitol Hill," the last thing President Trump and I wanted was "to hand Congress an excuse to abort the operation" with an outbreak of violence and chaos and the last people "who wanted to see violence erupt that January 6 day on Capitol Hill" included both myself and President Trump (along with Stephen K. Bannon).

18.    To date, the Committee has offered no significant or conclusive proof that the November 3 election was fair or that the Navarro Report was in any way inaccurate or misleading.  Nor has the Committee offered any significant or conclusive proof that either I or President Trump or any of the senior advisors sought to <u>illegally</u> overturn the election.

19.    To recap, the Committee asserts without facts and evidence that "many claims of purported fraud in the election...have been discredited in public reporting, by state officials, and courts." This is but one of many pieces of evidence that the Committee is operating upon under the flawed assumption that the 2020 presidential election was fair and without reasonable controversy. From this flawed assumption, this kangaroo court of a Committee is pursuing a judicial function in seeking to punish President Trump and any of his senior advisors who publicly reject the unproven claim that the election was indeed fair.

20.    Against this stark backdrop of lack of evidence for its allegations, the Committee continues to subject President Trump and senior advisors such as myself to the punishment of shame, humiliation, banishment, ostracization, and the incitement of public hatred by portraying us as insurrectionists rather than as patriots seeking to get the bottom of what looks to be, just as with the Nixon-Kennedy 1960 election, a likely stolen election.[15]

21.    The Committee's efforts are also geared at inflicting equally traditional forms of punishment such as imprisonment and the confiscation of the property of Trump's most senior advisors who dare to defy the Committee's unlawful subpoenas and investigation using the U.S. Attorney and the vast resources of a Democrat-controlled Department of Justice as its cudgels. In seeking to build a criminal case against President Trump and his most senior advisors for their alleged roles in seeking to overturn a fair election, the Committee is clearly venturing far beyond its facially valid legislative function into the realm of the unconstitutional pursuit of a

judicial *cum* political function.

22.    On February 9, 2022, I received the Committee's subpoena in which I was "commanded to be and appear before the Select Committee to Investigate the January 6th Attack on the United States Capitol" (Committee) and "to testify at a deposition touching matters of inquiry committed to said committee or subcommittee" on March 2, 2022 at 10:00 am and further to "not to depart without leave of said committee or subcommittee."[16]

23.    I was also commanded under this subpoena "to produce the things identified on the attached schedule."[17]  I found the breadth and invasiveness of this subpoena and its attachment to be breathtaking and a direct frontal assault on both executive privilege and testimonial immunity while it also gave the appearance of a criminal investigation, not a fact-finding mission.

24.    Upon receipt of this subpoena, as a former senior White House adviser to President Donald J. Trump clearly covered by testimonial immunity, I was faced with three broad choices:[18] (1) respect President Trump's invoking of executive privilege in the Committee's investigation and fail to comply with the subpoena; (2) unilaterally waive President Trump's Executive Privilege and my own testimonial immunity by providing all of the requested documents and testifying before the Committee as commanded; or (3) preserve President Trump's executive privilege while at least superficially meeting the requirements of the subpoena by appearing before the Committee to testify but invoking my Fifth Amendment rights during such testimony.

25.    After considerable reflection and a broad overview of the law – both settled and unsettled – I chose Choice #1: fail to comply with the subpoena while preserving the executive privilege asserted by President Trump.  I was swayed both by my own personal experience

20

within the White House as one of the president's most senior and trusted advisors and by the

wisdom of *United States v. Nixon* that opines that "[a] President and those who assist him must

be free to explore alternatives in the process of shaping polices and making decisions and to

do so in a way many would be unwilling to express except privately," *United States v. Nixon,*

*418 U.S. 638 at 708.*

26.     Further, as noted in *Trump v. Mazars, 140 S. Ct. 2019 at 2032*, executive privilege

"safeguards the public interest in candid, confidential deliberations within the Executive

Branch" while *Nixon v. Administrator of General Services* opines that executive privilege "is

necessary to provide the confidentiality required for the President's conduct of office" because,

"[u]nless he can give his advisers some assurance of confidentiality, a President could not expect

to receive the full and frank submissions of facts and opinions upon which effective discharge

of his duties depends." *Mazars, 140 S. Ct. at 2032* at 448–449.

27.     From this vantage point, I believed at the time of my receipt of the Committee's

subpoena – and also keenly mindful of the absolute testimonial immunity historically granted

to senior White House officials -- it was my duty to President Trump, the Constitution, and the

Republic that I had pledged to serve and defend to honor the executive privilege that President

Trump had invoked.

28.     I made Choice #1 knowing that it would put me in an untenable position, and I did

so despite the obvious risks to my freedom and my financial position that might come with a

criminal contempt prosecution.[19]  That I might face criminal charges was no idle speculation as

one such criminal prosecution was already in progress against another former Trump advisor

Stephen K. Bannon and another criminal contempt charge was possibly pending against former

Trump Chief of Staff Mark Meadows.  Yet, in making Choice #1, I believed that duty and honor

must come first.

29.    Regarding Choice #2, comply with the Committee's subpoena, there is settled law that dictates the executive privilege in this matter was not mine to waive, e.g., the Supreme Court has held that executive privilege "can neither be claimed nor waived by a private party." *United States v. Reynolds, 345 U.S. 1, 7–8 (1953).*  If I were to ignore President Trump's invocation of privilege by opting for Choice #2, I would be engaging in an act contrary to settled law while violating due process.  This would be an act of betrayal both of the president I served and of my country.  I would be violating constitutional law by waiving the privilege myself and fully cooperating with the Committee.

30.    With Choice #2, to the extent that I was choosing it "to save my own skin," as the saying goes, I would be committing an act of cowardice under partisan Congressional fire – the exact opposite of the honorable and patriotic choice epitomized by Choice #1.  I note here in this regard that several high-ranking Trump White House officials, including President Trump's son-in-law Jared Kushner, chose to ignore the critical privilege and immunity issues at stake and testify before the Committee.  Predictably, their cowardly actions would be used to criticize both my principled position as well as President Trump himself, as illustrated in this news coverage of a comment from the Committee's Chair Bennie Thompson: "A person close to the Trump family told CNN the former President's children never saw a reason not to cooperate with the committee because none of them felt appearing before the panel put them at any risk.[20]...In his interview with CNN, Thompson questioned why the former President did not object to his family members testifying while key White House aides are now being held in contempt of Congress by the House after refusing to testify, saying they had been instructed by the President to claim executive privilege over their conversations. '"Now we have four individuals who are

being held in contempt of Congress because they were directed by the President not to come. So they are under the bus, but his children are not. They came," Thompson said. "Now to me, that's Donald Trump that we are discovering. It's 'do as I say, but not do as I do.' Do you understand? I say don't go and testify, but when my children or my in-laws are involved, you can go testify.'"[21]

31.    As for Choice #3, complying with the subpoena but invoking my Fifth Amendment rights, I believed that by doing so I would be undermining executive privilege in a way every bit as dishonorable as Choice #2. To wit: I would be invoking the Fifth Amendment rather than staunchly defending Executive Privilege.

32.    With Choice #3, I also was keenly aware of the reputational harm that would come because far too many Americans wrongly associate guilt with invoking the Fifth Amendment.    As just one data point, a Morning Consult poll of 1993 registered voters conducted May 10-14, 2018 found that 36% of respondents believed that invoking the Fifth Amendment "usually implies the person is guilty."[22]   Here, Justice Felix Frankfurter has famously criticized those who believe the Fifth Amendment implies guilt: "Such a view does scant honor to the patriots who sponsored the Bill of Rights as a condition to acceptance of the Constitution by the ratifying States. The Founders of the Nation were not naive or disregardful of the interests of justice." Of course, no such admonition by Frankfurter would have been necessary if the problem didn't exist. *United States v. Chase*, 281 F.2d 225, 228 (7th Cir. 1960).

33.    In this case, Justice Frankfurter might just as well have been criticizing the Chair of the Committee Bennie Thompson for unlawfully judging – and publicly branding -- anyone who invoked the Fifth Amendment during testimony before his Committee as guilty indeed.  In a public statement on December 2nd, 2021 illustrating the unconstitutional punitive nature of a

Committee that is supposed to be pursuing a non-punitive legislative agenda and exposing the "judge, jury, and executioner" judicial function mindset of the Committee, Thompson baldly asserted that those who appear before his Committee and invoke their Fifth Amendment privilege against self-incrimination are "part and parcel guilty to what occurred." Tim Hains, *Jan. 6 Committee Chairman Bennie Thompson: If You Plead The Fifth, You're "Part & Parcel Guilty*, Real Clear Politics, Dec. 2, 2021.[23]

34.    Having worked hard my entire life to live honorably with a reputation for honesty, I was not inclined to invoke the Fifth Amendment in a demonstration of gamesmanship to avoid a contempt charge. Nor was I going to be tainted with the charge of "guilty until testifying" in the ugly game Thompson and the Committee were obviously playing.

35.    Finally, I note that I was aware at this time of a critical decision I would have to make that if I were to bend to the Committee's coercive will.  To wit, I would not only be undermining the institution of executive privilege and its critical role in the separation of powers. I would be weakening the companion institution of testimonial immunity for senior White House advisers.

36.    While there has been some case law arguing for a qualified rather than absolute executive privilege – the law remains unsettled – history and the law on testimonial immunity has leaned far closer to the absolute end of the spectrum.  The Office of Legal Counsel in the Department of Justice (OLC) has long contended, dating back more than 50 years, that such immunity is absolute; and there is no settled law to the contrary. "Since the 1970s, this Office has consistently advised that 'the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee' on matters related to their official duties'" and "[t]he President and his immediate advisers-that is, those who customarily meet

with the President on a regular or frequent basis-should be deemed absolutely immune from testimonial compulsion by a congressional committee.' Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations." Memorandum For Pat A. Cipollone Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.

37.   Having made Choice #1 to honor the executive privilege invoked by President Trump (and cognizant of the sanctity of absolute testimonial immunity), I responded to the subpoena I had received in an email dated February 27, 2022 addressed to Senior Investigative Counsel for the Committee, Dan George as follows: "Please be advised that President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied.  Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter."

38.   Note that I clearly assert in this email that the privilege is not my to waive, and I clearly indicate the Committee should "directly negotiate with President Trump and his attorneys."

39.   The court can also see in my response that I am anticipating a possible assault on President Trump's privilege by Joe Biden by clearly indicating that the privilege is not Biden's to waive either.  In fact, the very next day, on February 28, 2022 I received a letter by email from Deputy Counsel to the President Jonathan Su of the White House Legal Counsel's office advising me that President Biden "has decided not to assert executive privilege" as regards to either my "testimony" or "documents" commanded by the Committee."[24]

40.   Even a cursory view of the case law, Executive Orders, and OLC opinions

indicates that Su's bold assertion that Joe Biden has the legal authority to waive the privilege of his immediate predecessor and the immunity of that's predecessor's senior advisers within a matter of mere months of the transition of power is anything but settled law.

41.    Upon receipt of the Su letter, I immediately wondered whether the Committee had had somehow signaled to Su and the White House to take this action as a way of further coercing me into bending to their will.    Here, it has been said that there are no conspiracies, but there are also no coincidences while Occam's Razor teaches us that the simplest explanation is also the most likely.  In this instance, the simplest explanation for the Su/Biden correspondence is not that it was a coincidence but rather that the Committee either tacitly or explicitly colluded with the White House to elicit this correspondence in a blatant attempt to do an end run around due process and the law.  If Joe Biden could strip Donald Trump of executive privilege and me of testimonial immunity, then neither I nor any Trump senior White House adviser would have an excuse not to appear before the Committee – or so their illegal and indefensible position would become.

42.    My second thought upon receiving the Su letter was that no court of law would find it reasonable to allow an incumbent president to strip his predecessor of executive privilege within months of taking office no matter what fig leaf of a broader national interest the incumbent might seek to cover its assault in.  The chilling effect of such an action, if upheld by the courts, would be tantamount to destroying executive privilege and testimonial immunity as we know them as no future White House senior advisor or president would have confidence in the privilege.

43.    To make this point early, and it shall be made often, whatever vague "extraordinary" "national interest" the Su letter cites in support of its half-baked assertions, these

concerns pale in comparison to the transformation of executive privilege and testimonial immunity into partisan ping pong balls that provide no real assurances to future White House advisers or presidents of the kind of confidentiality necessary to make sound decisions.

44.     Within the context of strategic game theory, if the assault on Executive Privilege and testimonial immunity by the Committee and the White House in this case are allowed by this court, it will spell the end of both Executive Privilege and testimonial immunity as this Republic has known them because we will quickly bear witness to a "repeatable game" in which whichever party controls <u>both</u> the House of Representatives and White House, that party will effectively weaponize Congress's investigatory powers in ways designed to: (1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office.  Of course, this will all be done under the false flags of national emergency and national security.

45.     If, in this case, the Committee and Joe Biden are able to effectively establish the principle that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024.  In fact, <u>I don't need to imagine this repeat of the strategic game.  If I'm not dead or in prison, I will lead the charge.</u>

46.     On February 28th, after receiving Mr. Su's correspondence and additional correspondence from Mr. George, I reaffirmed to Mr. George that: "President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied."

47.     I would further subsequently note in a press release on March 26, 2021 that I would honor whatever decision President Trump made in the matter and assist the Committee in expediting the matter to the Supreme Court to settle the law on this controversy: "This is an

unprecedented partisan assault on executive privilege. The committee knows full well that President Trump has invoked executive privilege and it is not my privilege to waive. If President Trump waives the privilege, I would be happy to testify. It is premature for the committee to pursue criminal charges against an individual of the highest rank within the White House for whom executive privilege undeniably applies. Until this matter has been settled at the Supreme Court, where it is inevitably headed, the Committee should cease its tactics of harassment and intimidation. I would be happy to cooperate with the committee in expediting a review of this matter by the Supreme Court and look forward to arguing the case."[25]

48.     After a more careful reading of the Su letter, it is clear, if not altogether obvious, that the Biden White House does not directly seek to waive President Trump's privilege in the matter. All Mr. Su is informing me of is that President Biden "has decided not to assert executive privilege." To believe that this waives the privilege invoked by President Trump, <u>one must make the leap that the decision by Biden not to invoke privilege is equivalent to waiving the privilege invoked by Trump. This is not at all clear from the Su letter</u>. In fact, Su may be purposely opaque knowing the quicksand of unsettled law he has waded into. And it may be useful to note as well that Su makes no reference to any case law that would indicate Biden is seeking to hijack the Trump privilege. Yet, the Committee would be more than eager to make this leap.

49.     On March 28, 2022, the Committee voted unanimously (9-0) to recommend that I, along with former Trump senior White House adviser Dan Scavino, be held in contempt of Congress.

50.     On April 4, the House Rules Committee voted along party lines, 9 Democrats for to 4 Republicans against, to advance the contempt charge against me.[26]

51.     On April 6, the House of Representatives passed H.Res. 1037 virtually along party lines by a vote of 220-203, with two Republicans voting in the affirmative.[27]  This Resolution recommends to the United States Attorney for the District of Columbia that the Plaintive "be proceeded against in the manner and form provided by law" for criminal contempt of Congress, whereby this contempt charge carries with it a prison term of up to one year and the confiscation of the Plaintiff's of up to $100,000.

52.     The Supreme Court has long recognized that due process protections apply to all congressional investigations.  *Watkins v. United States*, 354 U.S. 178,188 (1957); *Quinn v. United States*, 349 U.S. 155,161 (1955).  The Committee had its own duty to honor due process and attempt such negotiations with President Trump in good faith – and thereby avoid obvious bill of attainder complications.  Negotiations was the least burdensome (punitive) alternative at the Committee's disposal while a civil suit was the next least burdensome alternative.  Instead, the Committee pursued the most burdensome (punitive) alternative of a criminal contempt of Congress charge.

## My Subpoena Was Not Issued by a Duly Authorized and Properly Constituted Committee and is Unenforceable

1.     Duly authorized congressional committees have subpoena authority implied by Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). The Committee is not a duly authorized or properly constituted congressional committee because it fails to comport with House Resolution 8 117th Cong. (2021)[28] and its own authorizing resolution, House Resolution 503 117th Cong. (2021).[29]

2.     Section 3(b)(1) of H.Res. 8 provides: "During the One Hundred Seventeenth Congress, the chair of a standing committee…upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena,

by a member or counsel of such committee." [emphasis added]  By H.Res 8, consultation with the ranking minority member is therefore a necessary condition for the issuance of any subpoena by the Committee.

3.      Section 5 (c) (6)(A) of H. Res. 503 states: "The chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress." By H.Res 1037, consultation with the ranking minority member is likewise a necessary condition for the issuance of any subpoena by the Committee.

4.      Section 2(a) of H. Res. 503 states that "The Speaker shall appoint 13 Members to the Committee, 5 of whom shall be appointed after consultation with the minority leader."

5.      Presumably, the minority leader would propose five members of his own party under Section 2(a) of H. Res. 503 so that the partisan balance would reflect an albeit still partisanly skewed 13-5, near three-to-one Democrat majority on the Committee.

6.      Upon passage of H.R. 503, Speaker Pelosi appointed Bennie Thompson to serve as Chair of the Select Committee along with six additional Democrat members: Rep. Zoe Lofgren of California, Rep. Adam Schiff of California, Rep. Pete Aguilar of California, Rep. Stephanie Murphy of Florida, Rep. Jamie Raskin of Maryland, and Rep. Elaine Luria of Virginia.[30]

7.      Following the instructions of H.R. 503, House Minority Leader Kevin McCarthy recommended Rep. Jim Banks of Indiana, to serve as minority ranking member of the Committee.[31]   However, Pelosi refused to seat Banks; and the Committee has no ranking minority member despite the requirement of H.Res. 503 that it should and the requirements

imposed by H.Res 8 for the issuance of valid subpoenas.

8.      Minority Leader McCarthy also recommended to Pelosi the appointment of four additional Republican members to serve as minority members on the Select Committee – Illinois' Rodney Davis: Ohio's Jim Jordan, North Dakota's Kelly Armstrong, and Texas' Troy Nehls. None were appointed by Pelosi.

9.      If Pelosi had simply appointed the members recommended by McCarthy along with Banks as ranking minority member, this would have met the requirements of H.Res. 503 to have a 13-member commission with five minority representatives and a ranking minority member.[32] Instead, without the consultation of McCarthy, again in contradiction to H.Res. 503, Pelosi appointed Illinois' Adam Kinzinger and Wyoming Liz Cheney—two Republicans with clear animus against President Trump.

10.     The Committee's failure to comport with Section 2(a) of H.Res. 503 is evident in: (1) the failure of House Speaker Nancy Pelosi to appoint the proper number of members (9 instead of 13); (2) an even more skewed 7-2 ratio of Democrats to Republicans instead of the 8-5 ratio called for by H.Res. 503; (3) the failure of Pelosi to consult with Minority Leader Kevin McCarthy prior to the seating of the two titular Republicans on the Committee, neither of which were proposed by McCarthy; (4) the absence of a ranking minority member; and (5) the rejection by Pelosi of all five members, including a ranking minority member, proposed by McCarthy.

11.     The Committee's failure to comport with Section 3(b)(1) of H. Res. 8 as well as Section 2(a) of H. Res. 503 is evident in the fact that of those nine members Speaker Pelosi appointed to the Committee, none were appointed after consultation with the ranking minority member as required by the authorizing resolutions.

12.     Since Speaker Pelosi allowed no ranking minority member on the Committee

there is no ranking minority member to "consult" with and therefore the Chair may not "order the taking of depositions" "pursuant to subpoena."

13.    Absent a ranking minority member, the Committee has no legal authority to duly issue, much less legally enforce subpoenas and advance resolutions finding private citizens in contempt of Congress for refusal to comply with the illegal subpoenas issued by the Select Committee.

14.    The absence of a ranking minority member on the Committee alone is sufficient for this court to rule that all of the Committee's subpoenas are invalid.   Chairman Thompson derives the authority to issue subpoenas from both H.Res. 8 and H.Res. 503 Section 5(C)(6)(A) of the Committee's authorizing statute, but these authorities are qualified, not absolute. The Committee chairman may not order the taking of depositions without consultation with the ranking minority member of the Committee.

15.    As the Committee has no ranking minority member, Chairman Thompson failed to make the requisite consultation before issuing the subpoena to me. The subpoena thus runs afoul of the Committee's authorizing resolution as well as H.Res. 8, making it invalid and unenforceable; and my failure to comply with the Committee's subpoena cannot be grounds in H. Res. 1037 for holding me in contempt of Congress.

16.    In a public statement, Pelosi acknowledged she had taken an "unprecedented decision"[33] in establishing what amounts to nothing more than a highly partisan and score-settling kangaroo court of a Committee with a fig leaf of Republican membership, no ranking minority member, and four empty seats in clear violation of the specifications of H.R. 503 for a duly authorized and properly constituted committee.

17.    Congress' failure to act in accordance with its own rules is judicially cognizable.

*Yellin v. United States*, 374 U.S. 109, 114 (1963). This is particularly significant where a person's fundamental rights are involved.

18.　In this case, former senior White House officials, including myself, have been held in contempt of Congress on the basis of invalid and unenforceable subpoenas from a Committee that is neither duly authorized nor properly constituted yet we face possible imprisonment of up to one year and a significant confiscation of personal property in the forms of up to $100,000 in fines and the substantial cost burden of legal representation.

## The Legislative Acts of the Committee and H.Res 1037 Violate the Principle of Separation of Powers Because They Also Seek To Fulfill a Judicial Function

1.　A key controversy before this court in this case for which there is no settled law is this: If a Congressional entity such as the Committee is pursuing an investigation under the Constitutional flag, and behind the shield of, what appears to be a facially valid legislative function, is it also then free to use that investigation and its subpoena powers to simultaneously pursue an illegitimate judicial function that violates the principle of separation of powers? Here, it should be obvious that the presence of a facially valid legislative function does not rule out the presence of a punitive judicial function – the pursuit of these legitimate legislative and illegal judicial functions can occur simultaneously.

2.　The Constitution contains no provision explicitly declaring that the powers of the three branches of the federal government shall be separated yet the principle of separation of powers is implicit in its construction: Article I vests all legislative powers in the Congress; Article II vests executive power in the president, and Article III vests judicial power in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.

3.     Congress has no enumerated constitutional power to conduct investigations or issue subpoenas.  For a Congressional Committee to duly issue valid and enforceable subpoenas in the course of an investigation – and by extension, seek contempt charges against those who fail to comply with such subpoenas -- that investigation must have a valid and <u>non-punitive</u> "legislative function."[34]

4.     Congress' power to investigate is limited because it is "justified <u>solely</u> as an adjunct to the legislative process."[35] *McGrain v. Daugherty*, 273 U.S. 135 (1927).   (emphasis added).

5.     A hallmark of the judicial function is the power to punish.  "The power to punish is inherent in the courts." *United States v. Landes*, 97 F.2d 378, 381 (2d Cir. 1938).

6.     To ensure the principle of separation of powers, Congress has no judicial power and therefore does not have the power to investigate in pursuit of a judicial function and "inflict punishment." *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).

7.     The Committee and its members have "no Congressional power to expose for the sake of exposure" *Watkins v. United States*, 354 U.S. 178, 200 (1957).   Exposing for the sake of exposure represents an unlawful exercise of judicial power and seeks to perform a judicial function because, in causing such results as shame, banishment, humiliation, or ostracization, such exposure administers various forms of punishment. *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).  Justice Black notes "There is nothing strange or novel about this kind of punishment. It is in fact one of the oldest forms of <u>governmental punishment</u> known to mankind; branding, the pillory, ostracism and <u>subjection to public hatred</u> being but a few examples of it. <u>Nor is there anything strange about a court's reviewing the power of a congressional committee to inflict punishment</u>. *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959)

[emphasis added]

8.    The courts have never firmly addressed the controversy of whether a Congressional investigation should be invalidated if that investigation represents a simultaneous exercise of both a facially valid legislative function and an unconstitutional and unlawful judicial function. Yet, as the frequency and intensity of overtly partisan and weaponized Congressional investigations have accelerated in the vacuum of settled law in this matter, it is a question and controversy that begs for this court's wisdom. To borrow a phrase from *Trump v. Mazars*, this case, the hallmark of which is Speaker Pelosi's frank admission of the overtly partisan construction of an "unprecedented" Committee, "represents a significant departure from historical practice." *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2031 (2020). Accordingly, this case and controversy by Pelosi's own words invites the court to settle the law and thereby set precedent.

9.    Historically, the courts have been reluctant to dive into the deep end of this separation of powers pool in their relatively few rulings on the subpoena power of Congress. For example, the *Comm. On Ways & Means v. U.S. Dep't of Treasury* notes that "[a] long line of Supreme Court cases requires great deference to <u>facially valid</u> congressional inquiries." *Comm. On Ways & Means v. U.S. Dep't of Treasury*, 1:19-cv-01974 (TNM), at *1 (D.D.C. Dec. 14, 2021). [emphasis added][36]

10.    The reluctance of the courts to pierce the veil of a facially valid legislative function and find a companion unconstitutional judicial function has been attributed in part to the 'hurly burly' nature of politics. As *Trump v. Mazurs* notes: "The question presented is whether the subpoenas exceed the authority of the House under the Constitution. Historically, disputes over congressional demands for presidential documents have not ended up in court. Instead, they

have been hashed out in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel). *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2029 (2020)

11.    The unwillingness of the Courts to look beyond facially valid congressional investigations may have been tolerable within the context of the balance of power within the three branches of government in prior times.  However, over time, the setting of this low, facially valid legislative function bar to the exclusion of the possibility that a judicial function is simultaneously and unconstitutionally being pursued has been an open invitation for legislators to pursue just such a judicial function under the false flag, and behind the shield of, their legislative function.

12.    The result of the court's silence in this matter is now clear: Repeated abuses by partisans and political score settlers like those on the Committee have institutionalized a partisan weaponization of Congress' investigatory powers that now threatens the delicate balance and separation of powers between the legislative, judicial, and executive branches of our government.

13.    In considering whether to address this controversy in this case, the court should indeed take Speaker Pelosi at her word when she describes the formation of the Committee as "unprecedented." It is indeed unprecedented for Congress to form a rabidly partisan and score-settling congressional committee that has no minority ranking member and fails to abide by its own authorizing resolution.  It is equally unprecedented to allow this Committee to wield such powerful investigatory powers in pursuit of a judicial function behind the flag and shield of a

facially valid legislative function.

14.    While the courts have been loathe to address the controversy before us, they have not been entirely silent on the matter.  For example, *Tenney v. Brandhove*, 341 U.S. 367, 377-78 (1951) opens the door to new precedent when it opines "To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive."   In *Tenney v. Brandhove*, such usurpation was not "obvious."   However, as shall be demonstrated with a review of the legislative history of the Committee and its members below, this is a case where such an usurpation is overwhelmingly and painfully obvious.[37]

15.    With regard to the importance of "legislative history," the courts have deemed the "legislative history" of any given investigation to be a critical factor in assessing the validity of a Committee's investigatory powers.  In *Barenblatt v. United States*, for example, the court references "[i]n the light of the Committee's history" to rule "legislative authority" "unassailable".[38]   The case likewise refers to the "persuasive gloss of legislative history"[39] and also uses the phrase "In light of the legislative history." *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).

16.    Building on *Barenblatt*, *Nixon v. Administrator of General Services* establishes a "legislative history" test to probe for the unconstitutional presence of the judicial function. It urges us to ask in that case whether the "legislative history" indicates if "the Act before us is regulatory [legislative] and not punitive in character?" 408 F. Supp., at 373 *Nixon v. Administrator of General Services, 433 U.S. 425, 478 (1977).*

17.    In this case, the legislative history of the Committee and its members reveals an overwhelmingly "obvious" pattern of the weaponization of Congress' investigatory powers to

pursue a punishing judicial, and by implication, a political function.  As Justice Black might say today "It seems to me that the proof that the ... Committee is here undertaking a purely judicial function is overwhelming" *Barenblatt v. United States*, 360 U.S. 109, 154 (1959).

18.     The "overwhelming" and "obvious" proof in this case is embodied a legislative history dating back more than five years that demonstrates the repeated attempts of the Speaker of the House and the members of the Committee to publicly shame, humiliate, banish, ostracize, and possibly even imprison President Trump by trying him in their various kangaroo courts and legislative acts.  Through such exposure for the sake of exposure, they have incited public hatred and thereby punished Trump by harming his re-election chances in 2020 even as they have sought repeatedly to remove him outright from office and prevent him from either legally or practically from ever occupying the Oval Office again by running in, and winning, the 2024 election.  This sordid record of the Committee and its members has been nothing more and nothing less than the pursuit of a judicial function behind the mask and shield of a facially valid legislative function.  As *McGrain v. Daugherty* once warned in another context "[t]he committee has assumed all of the functions of prosecutor, judge and jury with apparently none of the customary rules governing evidence and procedure. " *McGrain v. Daugherty*, 273 U.S. 135, 145 (1927).

19.     The legislative history of the Committee itself reveals its clear partisan and score-settling intent to punish and humiliate President Trump in the course of its investigation and in pursuit of a judicial function.

20.     On May 14, 2021, Democrat Congressman Bennie Thompson introduced H.R. 3233, a *bicameral* bill to establish a ten-member commission to investigate the January 6th assault on the Capitol requiring approval of both the House and Senate.[40]  This commission, by

legislative design, would have struck a very clear bipartisan 5-5 balance. It was to consist of five members appointed by Democrats, five members appointed by Republicans, a Democrat Chair and a Republican Vice-Chair.[41]

21.    While H.R. 3233 passed the House on May 19, 2021 by a 252 – 175 vote , it failed in the Senate when a cloture motion failed by a vote of 54 yeas to 35 nays.[42]  In response, on June 28, 2021, Speaker Pelosi took the Senate out of the equation – and therefore a <u>bicameral</u> approach to the proposed investigation – by next introducing a simple House Resolution requiring only the approval of the House she controlled.

22.    Pelosi's Democrat-controlled House passed H. Res. 503 on May 21, 2021 on a virtually party-line 222-190 vote.[43] Only two Republicans, Rep. Liz Cheney of Wyoming and Rep. Adam Kinzinger of Illinois – both with scores to settle against Donald Trump – voted in favor of H. Res. 503.  Each would wind up on the Committee as the only two titular Republicans.

23.    H. Res. 503 offers a very sharp <u>partisan</u>, one-legislative-chamber contrast to the bipartisan, bicameral construction of H.R. 3233. As has been demonstrated, instead of a <u>commission</u> evenly split between Democrats and Republicans,  H. Res. 503 specifies the creation of a highly partisan and score-settling <u>Committee</u> intent on punishing and humiliating President Trump, inciting public hatred, and ensuring he never becomes president again through the exercise of an illegitimate and unconstitutional judicial function.

24.    Just as this Committee has a sordid legislative history offering obvious and overwhelming proof that it "is undertaking a purely judicial function," *Barenblatt v. United States*, 360 U.S. 109, 154 (1959), so, too, does <u>the far broader legislative history</u> of the Committee <u>members</u> reveal a clear intent to simultaneously pursue a judicial *cum* political function rather than a purely legislative function.  This legislative history spanning a period of

more than five years reveals at least seven additional legislative acts along with a "Russia Hoax" perpetrated by Committee members seeking to shame, humiliate, and banish President Trump from office while inciting public hatred of Trump and, by implication, Trump's advisers. These seven legislative acts include:

    a.   H.Res. 1987, introduced on April 6, 2017 and sponsored by Committee member Jamie Raskin, would have established in the legislative branch an Oversight Commission on Presidential Capacity to determine whether the President is mentally or physically unable to discharge the powers and duties of office.[44]  Its clear target was Trump, and the clear goal was to remove him from office;

    b.   H.Res. 496, introduced on August 18, 2017, "censures and condemns President Trump for his inadequate response to the violence in Charlottesville, Virginia, on August 12, 2017, for his failure to condemn the White supremacist groups responsible for actions of domestic terrorism, for asserting that "both sides" were to blame and excusing the violent behavior of participants in the Unite the Right rally, and for employing people with ties to White supremacist movements in the White House. [45]  It also urges President Trump to fire all White House advisors who have urged him to cater to the White supremacist movement;"[46]

    c.   H.Res. 660, introduced on October 29, 2019 as part of the first impeachment trial of President Trump,[47] directed "certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes;"[48]

d.  H.Res. 755, introduced on December 10, 2019, impeaches President Donald J. Trump for high crimes and misdemeanors.  The resolution sets forth two articles of impeachment of the President: (1) abuse of power by soliciting the interference of Ukraine in the 2020 U.S. presidential election, and (2) obstruction of Congress by directing defiance of certain subpoenas issued by the House of Representatives;[49]

e.  H.Res. 8548, introduced on October 9, 2020 and sponsored by Committee member Jamie Raskin, would have established in the legislative branch a Commission on Presidential Capacity to Discharge the Powers and Duties of the Office to determine whether the President is mentally or physically unable to discharge the powers and duties of office;[50]

f.  H.Res.24, introduced on January 11, 2021, impeaches President Donald John Trump for high crimes and misdemeanors.  It sets forth an article of impeachment stating that President Trump incited an insurrection against the government of the United States;[51] and

g.  H. Res. 21, introduced on January 11, 2021 by Committee member Jamie Raskin, calls upon Vice President Michael R. Pence (1) to immediately use his powers under section 4 of the Twenty-fifth Amendment to convene and mobilize the principal officers of the executive departments to declare that the President is unable to successfully discharge the duties and powers of his office, and (2) to transmit to the President pro tempore of the Senate and the Speaker of the House notice that he will be immediately assuming the powers and duties of the office as Acting President.[52]

25.    As to how each of the members of the Committee participated in one or more of these legislative acts (and otherwise demonstrated anti-Trump behavior), the Chair of the Committee, Bennie Thompson, voted "yes" on H. Res. 660,[53] he cosponsored H. Res. 496[54] condemning and censuring President Donald Trump, voted yes on both impeachment trials[55] and did not show up at President Trump's inauguration in 2016.[56] Indicating his desire to punish the president with his removal from office, Thompson has described President Trump as "racist and unfit to serve." [57]

26.    Committee member Jamie Raskin cosponsored both H. Res. 660[58] and H. Res. 496,[59] voted "yes" on both impeachment trials, [60] and was the lead House Impeachment Manager for the second impeachment trial.[61]   Raskin also authored H. Res. 21,[62] H.Res 1987,[63] and H.Res. 8548.[64] In 2018, Raskin set up a panel of mental health experts to publicly discuss the president's mental fitness,[65] has referred to Trump as "a barbarian,"[66] consistently questioned Trump's mental capacity,[67] repeatedly pushed the phony Russia hoax,[68] and, revealing his clear intent to use Congress' investigatory powers for a judicial function, publicly stated that "We have to come up with a legislative mechanism for calling a president to account if he decides to turn the White House into a for-profit enterprise. We cannot allow that precedent to stand."[69]

27.    Committee member Adam Schiff voted "yes" on H.Res. 660,[70] was the lead investigator for the first Trump impeachment trial of President Trump,[71] and voted yes for both impeachments.[72] He also cosponsored H. Res. 21.[73]

28.    Committee member Zoe Lofgren voted "yes" on H. Res. 660, [74] cosponsored H. Res. 24,[75] and H.R. 1987, [76] and voted "yes" on both impeachment trials. [77]  In 2017, Lofgren served as a member of the Democracy Reform Taskforce that claimed President Trump had "shown blatant disregard for the laws and norms in place to prevent public corruption."[78]

Lofgren also boycotted the inauguration of President Trump in 2017.[79]  In revealing her desire for Congress to wield more judicial power, she opined that Congress needs "more enforcement authority."[80] She also introduced a resolution urging a "medical and psychiatric evaluation of US President Donald Trump."[81] Illustrating her desire to publicly humiliate and shame the president and incite public hatred, Lofgren stated that "POTUS is an ignorant bigot trying to delegitimize duly elected Members of Congress based on ethnicity and gender. President Trump shames our country."[82] That Lofgren wants to use the investigatory and impeachment powers of Congress to serve a judicial function and thereby, in the ultimate punishment, end the political career of President Trump is evident in her saying that it "was both constitutional and necessary to impeach and convict former President Trump...and to disqualify him from holding future office.[83]

29.    Committee member Elaine Luria voted "yes" on H.Res. 660,[84] cosponsored H.Res. 24,[85] voted "yes" on both Trump impeachments, [86] and boycotted Trump's 2020 State of the Union address.[87]  That she has not hesitated to sit as both judge and jury of President Trump in her quest to inflict punishment upon the president is evident in remarks about Trump such as ""It is clear to me that he has betrayed the public trust and abandoned his obligations to the Constitution by elevating his own interests over the national interest. Allegations of this gross misconduct meet the threshold of high crimes and misdemeanors set by the Constitution."[88]

30.    Committee member Pete Aguilar likewise voted "yes" on both impeachments[89] and cosponsored H.Res. 24[90] which initiated the second impeachment.  He also voted "yes" on H.Res. 660. [91]  In acting as judge and jury in the second impeachment trial, Aguilar insisted as if it were fact that "The fact is that President Trump attempted to use the power of his office to

coerce a foreign government to interfere in an American election."[92]  This was not a fact at all; it was merely an accusation designed to punish and humiliate.

31.     Committee member Stephanie Murphy voted "yes" on H.Res. 660[93] and both impeachments[94] while cosponsoring H.Res. 24.[95]  In a May 22, 2019 letter "My Thoughts on Impeachment," Murphy clearly expresses her intention to use the investigatory powers of Congress in a judicial function to coerce and punish not just President Trump but "anyone in his administration" that dares to defy a congressional subpoena: "Should President Trump or anyone in his Administration ignore a final federal court order to turn over information that Congress has requested, I would consider it a threat to our careful system of checks and balances and would therefore <u>support an impeachment inquiry on that individual</u>—the first step in the impeachment process and one that <u>better empowers</u> congressional investigators to attain documents and testimony."[96]  [emphasis added]

32.     Key Committee members were also instrumental in perpetrating a now deeply discredited "Russia Hoax."[97]  This was the spurious and now discredited claim that the 2016 Trump Campaign colluded with Russia to defeat Hillary Clinton and that Russia preferred Trump over Clinton because Russian intelligence operatives had damning evidence they could use to blackmail Trump once he ascended to the Oval Office.[98]

33.     The alleged "facts" of the Russia Hoax turned out to be a fiction ginned up by Democrat operatives paid by the Clinton campaign. These operatives, most prominently former British intelligence officer Christopher Steele, created a phony "Steele Dossier"[99] that created the false Russia Hoax narrative. The FBI would then use this dossier to bogusly obtain Foreign Intelligence Surveillance Warrants (FISA) warrants to spy on members of the Trump campaign. As events unfolded, the whole hoax itself would be given institutional credence by a series of

false statements.[100]

34.     Committee member Adam Schiff was the *de facto* leader in Congress pushing the Russia hoax and a primary source of false statements, to the point of being caught repeatedly in lies during his public appearances.[101] Upon becoming House Intelligence Committee Chairman in 2019, Schiff hired investigators and other personnel to launch the Russia Hoax investigation, and later expanded a probe into President Trump "beyond Russia" to investigate Trump's connections to other foreign countries.[102]

35.     The Chair of the Committee, Bennie Thompson created a task force in 2017 as part of the perpetuation of the Russia hoax.[103]

36.     This lengthy legislative history likewise illustrates how Speaker Pelosi has sought to weaponize the investigatory powers of Congress in pursuit of a judicial function aimed at the punishment of Donald Trump and senior advisers such as myself. Pelosi called for an FBI probe in February 2017 into President Trump's alleged financial and personal ties to the Russian government as part of the perpetuation of the Russia hoax and called for a second investigation in October 2017.[104] She endorsed the push to censure President Trump after events in Charlottesville.[105] She voted yes to impeach President Trump twice and oversaw the second impeachment trial. In 2020, Pelosi backed H. R. 8548[106] and is the chief architect of and catalyst for her own "unprecedented" Committee now seeking to punish and humiliate President Trump and incite public hatred against Trump, and by implication, Trump advisers such as myself.[107]

37.     As perhaps the most graphic illustration of how Pelosi and committees such as the Committee in this case are pursuing a highly punitive judicial *cum* political function, Pelosi was caught in a private meeting saying that "I do not want to see him impeached, I want to see him in prison."[108] She has described the President, himself, as "a hoax."[109] [emphasis added]

38.     From this broad, dynamic review of the legislative history, it should be clear that for more than five years, the American Republic has been cursed with various Democrat kangaroo courts and legislative acts in pursuit of a judicial *cum* political function often with the same Democrat kangaroos running those courts and sponsoring those acts.

39.     In this case, Speaker Pelosi, along with all seven Democrat members of the Committee, have yet again established a kangaroo court that has empowered them to act as judge, jury, and executioner through a judicial function replete with (1) multiple forms of punishment aimed at shaming, humiliating, banishing, ostracizing, and inciting public hatred; (2) the removal of President Trump from office; and (3)  the punishing, including possible imprisonment, of his most trusted senior advisors.   This is all being done through the unconstitutional weaponization of Congress' subpoena power and resultant punishment, coercion, and threats.

40.     The two Republican members of the Committee have a similar, albeit shorter, legislative history that reveals the score-settling nature of their assaults on President Trump and his advisors through the weaponization of the Committee's investigatory powers. Both Liz Cheney and Adam Kinzinger voted "yes" on the second impeachment trial of Donald Trump while Kinzinger repeatedly sided with the Democrats on the Russia hoax.   Kinzinger also publicly issued a statement asking President Trump to delete his Twitter account in December 2020 after President Trump was calling for investigations into the 2020 election.

41.     For his anti-Trump activities, Kinzinger was forced out of running for reelection by the subsequent backlash, holds Trump responsible and clearly has a score to settle with Trump.  In addition, Kinzinger is also considering a run for president so the elimination of the frontrunner Trump in the 2024 election through punishment and humiliation would be in

Kinzinger's self-interest.[110]

42.     Liz Cheney is a long-term foe of President Trump because of Trump's perennial criticism of Cheney's father; Vice President Dick Cheney.  According to Trump, Vice President Cheney played a major role in prosecuting the "endless wars" of Afghanistan and Iraq, wars that killed hundreds of thousands of people and drained trillions of dollars of treasure from our Republic.[111]

43.     That Cheney, along with the Chair Bennie Thompson, seek to use the Committee's subpoena power in a judicial function in violation of the principle of separation of powers is evident in their public statements that the purpose of their investigation is to ensure "those who are responsible for the attack are held accountable,"[112] to "tell the complete story of the unprecedented and extraordinary events of January 6th,"[113] and to "get answers for the American people about what happened on January 6th."[114] The Law Enforcement Experience on January 6th: Hearing Before the H. Select Committee to Investigate the January 6th Attack on the United States Capitol, 117th Cong. (2021) Statement of Elizabeth Cheney, Vice- Chair); Press Release, Thompson & Cheney Statement on Pentagon Officials' Reported Actions After January 6th (Sept. 16, 2021); Press Release, Thompson Statement on Cooperation of Witnesses (Oct. 14, 2021).

44.     This lengthy legislative history spanning a period of nearly five years reveals obvious, overwhelming, and indisputable proof that Speaker Pelosi and members of the Committee have a well-established pattern of seeking to weaponize the investigatory powers of Congress behind the mask and shield of facially valid legislative acts while simultaneously pursuing punitive, unconstitutional judicial agendas.  In this case, the clear arc of the Committee's investigation has to been to build a criminal case against President Trump while

four of the president's most senior advisers have been held in contempt and face possible prison terms and fines.

45.   Given that this Committee and its members been so clearly flushed out in the open in its pursuit of a judicial function by their legislative history, it is incumbent upon this court to address the controversy presented in this case.  To put this in a more textured, policy-analytic way, a clear controversy to be settled in this case by this court is whether there is a <u>threshold</u> above which the simultaneous exercise of a judicial function is sufficient to render illegal any legislative acts taken under the flag, and behind the shield of, the facially valid legislative function. Considering the facts presented in this case, no reasonable court would deny the need for such a threshold balancing test.  Nor, upon review of an abundance of evidence of a judicial *cum* political function of the Committee, would a reasonable court deny that in this case, that threshold has been more than exceeded.

46.   It is incumbent upon this court therefore to take Speaker Pelosi at her word. To recap, Pelosi has described the formation of this kangaroo court of a Committee as "unprecedented";[115] and it is indeed unprecedented for a rabidly partisan and score-settling congressional Committee that lacks no ranking minority member and fails to abide even by its own authorizing resolution to wield such powerful investigatory powers in pursuit of a judicial function behind the mask and shield of a facially valid legislative function.  <u>With her</u> <u>"unprecedented" pronouncement, Pelosi thereby has invited this court to establish new</u> <u>precedent in a new time where the weaponization of Congress' investigatory powers for judicial</u> <u>ends threatens to become  the new norm , thereby upsetting  balance of power among the three</u> <u>major branches of government.</u>

47.   As a private citizen and a former senior advisor to President Trump, I stand as

collateral damage from the unlawful and unconstitutional efforts of Speaker Pelosi and the Committee members to incite public hatred, punish through shame, humiliation, ostracization, and banishment, and perhaps even imprison Donald Trump and many of those like me associated closely with him.

48.    I am seventy-two years old.  I have spent my entire career in some form of public service – from the Peace Corps and more than twenty-five years as a professor at the University of California to my years in the White House.  Through my White House service, I can lay claim to saving thousands of American lives during the pandemic, helping President Trump create millions of jobs, and addressing numerous national and economic security issues related to the economic aggression of Communist China.  At this stage in my career, I should be allowed to retire with all of the thanks and honors and dignity and grace normally afforded people with such a resume.  Instead, I have been hauled before the Committee's kangaroo court, subjected to public hatred, and been forced to endure all the other punishments they can muster with their false accusations and threats of criminal prosecution.   Only by squarely addressing the controversies in this case and by granting the declaratory and injunctive relief that I seek will this punishment cease and be redressed.

## The Committee's Subpoena and Report 117-284 and H.Res. 1037 Violate the Constitutional Proscription Against Bills of Attainder

1.  Article I, Section 9, Clause 3 of the Constitution states that "No Bill of Attainder … Law shall be passed."

2.  *Nixon v. Administrator of General Services* defines a bill of attainder as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."  See *United States* v. *Brown*, 381

U.S. 437, 445, 447 (1965); *United States* v. *Lovett*, 328 U.S. 303, 315-316 (1946); *Ex parte Garland*, 4 Wall. 333, 377 (1867); *Cummings* v. *Missouri*, 4 Wall. 277, 323 (1867). *Nixon v. Administrator of General Services*, 433 U.S. 425, 468-69 (1977).

3.  *United States* v. *Lovett* notes the need for a liberal interpretation of what constitutes a bill of attainder: "(a) The Bill of Attainder Clause , Art. I, § 9, cl. 3, was intended to implement the separation of powers among the three branches of the Government by guarding against the legislative exercise of judicial power . Pp. 441-446.  (b) The Bill of Attainder Clause is to be liberally construed in the light of its purpose to prevent legislative punishment of designated persons or groups. *Cummings* v. *Missouri*, 4 Wall. 277; *Ex parte Garland*, 4 Wall. 333; *United States* v. *Lovett*, 328 U.S. 303. Pp. 447-449." [emphasis added]

4.  *United States v. Brown* makes clear that "[l]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution."  *United States v. Brown, 381 U.S. 437, 448 (1965).* [emphasis added]

5.  The Committee's subpoena and along with the Committee's Report 117-284 and H. Res. 1037 all represent forms of "legislative acts" under settled law. *United States v. Brown,* 381 U.S. 437, 448 (1965).  Each of these legislative acts identifies me as a named individual; and each violates the Constitutional proscription against bills of attainder.

6.  Historically,  common  bill  of  attainder  punishments  have  included "imprisonment, banishment, and the punitive confiscation of property by the sovereign." *Bellsouth Corporation v. F.C.C*, 162 F.3d 678, 685 (D.C. Cir. 1998).[116]  In this case, I

face possible imprisonment of up to one year – more than one-fourth of my remaining expected life as well as the confiscation of up to $100,000 of my retirement savings, a significant share of those savings.

7.  In this case, a Democrat-controlled House of Representatives has voted overwhelmingly along party lines[117] on the basis of the Committee's subpoena and the Committee's Report 117-284 to hold me in contempt of Congress without the benefit of addressing Congress on this Resolution and without the benefit of a judicial trial.  Furthermore, this legislative act has been taken based on an invalid and unenforceable subpoena that violates the principle of separation of powers and thereby falsely associates me with unpatriotic and treasonous efforts to overturn what Committee members insist was a fair election despite abundant evidence to the contrary, thereby inciting public hatred of me.  Through these legislative acts, the Democrat-controlled House has thereby subjected me to the punishments of shame, humiliation, ridicule, banishment, public hatred, and ostracization at great reputational cost.

8.  If the U.S. Attorney for the District of Columbia chooses to act on H.Res. 1037 and charge me with contempt of Congress – as has already been done in a similar case involving a former Trump senior adviser[118] – I face significant additional punitive consequences in the forms of both imprisonment for up to one year and the punitive confiscation of my property, i.e., up to a $100,000 fine.

9.  Even prior to, or absent any, any move to imprison and fine me by the U.S. Attorney, H.Res. 1037 is a punitive act of economic coercion and psychological terror designed to bully me into bending to the will of an illegally constituted Committee in unconstitutional pursuit of a judicial function.

10. H.Res. 1037, in and of itself, represents economic coercion and a de facto confiscation of my personal property because in order to defend myself against this bill of attainder, I must either spend what may well add up to more than $100,000 on legal representation. Alternatively, as I have chosen, I must do the legal work *pro se* and thereby pay the substantial opportunity costs of the time I must use by writing this brief and representing myself.

11. In addition, the stigma and public hatred that has come from a contempt charge implying a treasonous attempt to overthrow an allegedly fair election has turned me into a pariah in many academic and corporate quarters and thereby cost me remunerative opportunities ranging from teaching, lecturing, and public speaking to appearing on otherwise Republican-friendly networks like Fox News, e.g., Fox has adopted a cancel culture policy of refusing to put pro-Trump people like me on the air who question the results of the November 3 and are associated, falsely or otherwise, with the events of January 6. The loss of these remunerative opportunities has significant financial implications as teaching stipends and speaking fees have historically been important sources of my income stream while appearances on networks like Fox help promote the books and articles I write and thereby generate sales and royalties. Most broadly, the harm to my reputation has been incalculable.

12. It is well worth noting that a common political tactic used on both sides of the aisle is to engage in "lawfare" to tie up the time and resources of political rivals and possibly put them in jail. In this case, the Committee is simultaneously pursuing a judicial, rather than a purely legislative, function and brazenly violating the Bill of Attainder Clause in its efforts to ensnare Donald Trump and his most senior advisers in their tar pit of false

allegations, endless litigation, possible imprisonment, and the de facto confiscation of my personal property by necessitating expenditures on legal representation or incurring the opportunity costs of representing myself.

13. H.Res. 1037 as a legislative act represents a punitive psychological terror as well. At 72 years old, a one-year prison sentence would indeed take more than a quarter of my remaining expected life – the average expected life of a male in America is 76 years[119] -- while a $100,000 fine would confiscate a significant slice of my retirement nest egg. I do not look forward either to a prison cell or to having to choose between food or medicine as far too many American senior citizens must do just because an uber-partisan and score-settling kangaroo court decided to slap me with a bill of attainder and drain my pockets.

14. The set of deprivations that I face from the legislative acts of the Committee and H.Res. 1037 are "so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably … fall within the proscription of Art. I, § 9. *Nixon v. Administrator of General Services*, 433 U.S. 425, 473 (1977).

15. In reviewing whether the legislative acts of the Committee and H.Res. 1037 constitute bills of attainder, *Nixon v. Administrator of General Services* provides this court with a number of possible tests, including most pertinently: (1) "the law plainly must be held to be an act of nonpunitive legislative policymaking" for it not to be considered a Bill of Attainder; (2) the "legislative history" must indicate that "the acts are "regulatory and not punitive in character?" 408 F. Supp., at 373;" and (3) any given legislative act must use the "less burdensome alternative" to achieve "its legitimate nonpunitive objectives." *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977).

16. In the Nixon case, the Court found no evidence of a punitive component in the regulatory

act in question and therefore no bill of attainer issue.[120]  In this case, however, the Committee's subpoena, its recommendation to hold me in contempt of Congress, and the passage of H.Res. 1037 clearly fail Test One.  With all the threats of imprisonment and confiscation of my property along with the reputational harm, banishment, and ostracization these legislative acts carry, they each and together have an undeniable strong punitive objective.  That punitive objective is to bully and coerce me into violating what I believe to be my patriotic duty and obligation under the traditional institutions of executive privilege and testimonial immunity.  The presence of such a strong punitive objective, in turn, points to a clear violation of the bill of attainder clause according to Test One.

17. With Test Two, and as noted in *Doe v. Selective Service System,* the court in the Nixon case analyzed whether the law, viewed through the lens of its <u>legislative history</u>, reasonably could be said to "further nonpunitive legislative purposes" and concluded in the affirmative, thereby rejecting the bill of attainder claim by Nixon. *Doe v. Selective Service System*, 557 F. Supp. 937, 944 (D. Minn. 1983).

18. In this case, however, we clearly and firmly must reach the opposite conclusion as the legislative history of the Committee, together with the legislative history of Speaker Pelosi and the Committee members over a period spanning more than five years, points clearly to a punitive exercise of legislative power – and therefore the pursuit of a judicial function.

19. To recap, we reviewed the legislative history of the Committee, its members, and Speaker Pelosi at length in the previous section of this brief; and it provided this court with an undeniable spectacle of a series of kangaroo legislative acts and kangaroo courts formed

with many of the same "kangaroos" populating the Committee all seeking to punish President Trump and his advisers. From this legislative history, we must conclude that Test Two in this case points clearly to bills of attainder in the legislative acts of the Committee and Democrat-controlled House that specifically identify me by name.

20. It is worth noting here that *U.S. v. Brown* calls for such a full and dynamic analysis of the relevant legislative history when parsing bill of attainder issues, which is why in this case, we must provide such a legislative history analysis <u>not just of the Committee but its individual members as well as Speaker Pelosi.</u> Notes *U.S. v. Brown*:

> The Bill of Attainder Clause was not to be given a narrow historical reading ... but was instead to be read in light of the evil the Framers had sought to bar: legislative punishment, of any form or severity, of specifically designated persons or groups. *United States v. Brown, 381 U.S. 437, 442-43 (1965)*

> The proper scope of the Bill of Attainder Clause, and its relevance to contemporary problems, must ultimately be sought by attempting to discern the reasons for its inclusion in the Constitution, and the evils it was designed to eliminate. The best available evidence, the writings of the architects of our constitutional system, indicates that the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply — trial by legislature. *United States v. Brown, 381 U.S. 437, 442-43 (1965)*

> [T]he Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply — trial by legislature. *United States v. Brown, 381 U.S. 437, 442 (1965)*

21. <u>It is Test Three offered in Nixon v. GSA that should remove any legal doubt that the</u>

<u>legislative acts of the Committee and H.Res. 1037 represent bills of attainder</u>.  To recap, this test speaks to the need to "inquire into the existence of <u>less burdensome alternatives</u>" by which a "legislature could have achieved its legitimate nonpunitive objectives. *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977).  [emphasis added]

22. Clearly, if the Committee in this case has failed to rely on "less burdensome alternatives" to achieve its alleged "legitimate nonpunitive objectives," that furthers the case that the legislative acts of both the Committee and House of Representatives to pursue contempt of Congress charges against me constitute bills of attainders.

23. In this case, there surely was, as a matter of both fairness and due process, <u>two</u> far less burdensome alternatives available to the Committee to achieve its putatively "legitimate nonpunitive objectives": (1) negotiating with President Trump and his attorneys a full or partial waiver of executive privilege and/or testimonial immunity; and (2) a civil suit to enforce compliance with the subpoena rather using coercion and terror through a threatened criminal prosecution.

24. In my email response to the Committee on March 1, 2022, I indicated: "Please be advised that President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied. Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter."  That was the Committee's least burdensome alternative; yet, it appears to make no effort pursuit this alternative.

25. As a matter of due process and to avoid bill of attainder complications, the Committee could and should have pursued this far less burdensome alternative of negotiation than the one it chose.  Instead, either by coincidence or explicit or tacit collusion, the

Committee made an end run around Trump's invocation of executive privilege and testimonial immunity through the attempted stripping of that privilege and immunity by the incumbent president Joe Biden.

26. To recap, this end run is evident in Deputy Counsel to the President Jonathan Su's letter to me of February 28, 2022. Su notified me that "President Biden has determined that an assertion of executive privilege is not in the national interest" and that "[f]or the same reasons...President Biden...will not assert immunity to preclude you from testifying before the Select Committee." Yet, as this brief will address further in the next section, in the absence of criminal conduct, there is no settled law in support of such a fanciful and absurd action by an incumbent president to strip either executive privilege or testimonial immunity from a predecessor and those senior advisers like me who may have served that predecessor.

27. As a matter of fairness and due process and in the clear absence of settled law in support of the dubious right of an incumbent president to strip a predecessor of both privilege and immunity, it was incumbent upon the Committee to pursue the least burdensome alternative by directly negotiating with President Trump and his attorneys a full or partial waiver of executive privilege and related testimonial immunity. This was particular true because I made it clear publicly that I would abide by any decision made by President Trump in this matter: "If President Trump waives the privilege, I would be happy to testify."[121] Clearly, I am indicating to the Committee my full cooperation pending the outcome of their negotiation. Instead of pursuing such a negotiation, this kangaroo court of a Committee chose to dive right into the deep end of the pool of unsettled law on the rights of incumbent versus former presidents as regards the invoking or waiving of

executive privilege and the related testimonial immunity of senior White House advisors.

28. If the right of an incumbent president to strip his immediate predecessor of executive privilege and testimonial immunity were settled law, the Committee might have a leg to stand on in defending itself against the "failure to pursue the less burdensome alternative" charge I make in this brief. But for the Committee to proceed with the far more burdensome alternative of holding me in criminal contempt of Congress against the backdrop of a far from resolved controversy for which there is no settled law smacks of a purely partisan and punitive measure and exercise of the judicial function and further solidifies the bill of attainder case.

29. I include further in this record that in my email response of March 1, 2022 to the Committee, I also point out the following: "In closing, I note that the United States government is in possession of all my official White House communications which your committee has requested. While I do not give my permission for your Select Committee to access this information as it involves privilege, I am at least advising you of this fact." Clearly, much of the documentary material that the Committee with its subpoena was insisting that I provide was in the hands of the government itself. One wonders if the Committee has sought to obtain this material as a "less burdensome alternative." If so, the only remaining documentary material seemingly in play in their subpoena would be that of phone messages and email on my private accounts. Here, the less burdensome alternative would have been to simply subpoena such information from the service providers as they did with, for example, former Trump Chief of Staff Mark Meadows.[122] If the Committee did so, then they would have needed nothing from me and the contempt charge would have been all but moot.

30. To recap, negotiating directly with President Trump and his attorneys over a full or partial waiver in my case of executive privilege and/or testimonial immunity would clearly have been the least burdensome alternative the Committee could have pursued to achieve its alleged nonpunitive legislative end. Yet, there was also a second least burdensome alternative available to the Committee and the House well short of a criminal prosecution.

31. As the opinion of District Judge John D. Bates in *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 75-77 (D.D.C. 2008) makes clear, the second least burdensome alternative would have been to pursue a civil suit rather than a criminal prosecution. As OLC put it in a memorandum, a civil action would be superior because "Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function . . . [and] [a] civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents, not at inflicting punishment on an individual who failed to produce them." *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 76-77 (D.D.C. 2008). [emphasis added]

32. In *Committee on Judiciary v. Miers*, "[t]he Committee on the Judiciary ("Committee"), acting on behalf of the entire House of Representatives, ask[ed] the Court to declare that former White House Counsel Harriet Miers must comply with a subpoena and appear before the Committee to testify regarding an investigation into the forced resignation of nine United States Attorneys in late 2006, and that current White House Chief of Staff Joshua Bolten must produce a privilege log in response to a congressional subpoena. *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 55-56 (D.D.C. 2008).

33. *Miers* was a situation where Democrats controlled the House of Representatives as in this case but, unlike in this case, the Democrats faced an uncooperative Republican president

and Attorney General.  This effectively foreclosed the far most burdensome alternative of the highly punitive criminal prosecution Democrats originally sought.

34. After the Democrat-controlled House passed a resolution recommending criminal contempt charges against both Miers and Bolten – as the House has done against me in this case – the Republican Attorney General declined to prosecute. At that point, illustrating the viability of the less burdensome civil suit option while acknowledging the partisan nature of the battle, the Judiciary Committee filed the suit against Miers.  As noted in this lengthy passage from the *Miers* opinion:

> *Frustrated by the Executive's actions, the full Committee met on July 25, 2007 and adopted a resolution "recommending that the House of Representatives find that former White House Counsel Harriet Miers and White House Chief of Staff Joshua Bolten be cited for contempt of Congress for refusal to comply with subpoenas issued by the Committee." See 153 Cong. Rec. D1051-01 (2007). Chairman Conyers provided Mr. Fielding with a copy of the Committee's report in the hope that it might prompt the White House voluntarily to change its position. See Pl.'s Stmt. of Facts ¶ 52. He received no response. So, on November 5, 2007, the Committee filed its report with the full House of Representatives. Id. ¶ 54. Once again, Chairman Conyers wrote to Mr. Fielding to inform him of that development and to reiterate that the Committee still hoped "to resolve the issue on a cooperative basis"; Chairman Conyers even included "a proposal for resolving the dispute." Id. ¶ 55. This time, Mr. Fielding responded by rejecting Chairman Conyers's offer, explicitly noting that "[w]e are therefore at a most regrettable impasse." Pl.'s Mot. Ex. 34. He urged the Committee to "reconsider its proposed actions" and to accept the President's initial proposal. Id.*
>
> *The next day, however, the Attorney General responded that because Ms. Miers and Mr. Bolten were acting pursuant to the direct orders of the President, "the*

*Department has determined that non-compliance . . . with the Judiciary Committee subpoenas did not constitute a crime, and therefore the Department will not bring the congressional contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers." Pl.'s Mot. Ex. 40. With criminal enforcement of its subpoenas foreclosed, the Committee — invoking Resolution 980 — filed this action seeking a declaratory judgment and other injunctive relief. See Pl.'s Mot. at 14.*

*In support of the case before being "a justiciable controversy" and therefore a viable less burdensome alternative – not the reference to "not inflicting punishment" -- the opinion of District Judge John D. Bates cites "[t]wo significant OLC [Office of Legal Counsel] opinions issued during the Reagan administration" germane to this case.*

*In 1984, an opinion by Acting Assistant Attorney General Theodore Olson confirmed the viability of a federal civil suit brought by a House of Congress to enforce subpoenas issued to executive officials. See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 U.S. Op. Off. Legal Counsel 101, 137 (1984) (hereinafter "Olson OLC Opinion"). As OLC opined, Congress has three options available to enforce a subpoena against a recalcitrant respondent: (1) referral to the U.S. Attorney for prosecution of a criminal contempt of Congress charge; (2) detention and prosecution pursuant to Congress's inherent contempt authority; or (3) a civil action to enforce the subpoena in a federal district court. When the respondent is a member of the executive branch who refuses to comply on the basis of executive privilege, however, OLC stated that the "contempt of Congress statute does not require and could not constitutionally require a prosecution of that official, or even, we believe, a referral to a grand jury of the facts relating to the alleged contempt." Id. at 142 (emphasis added). That conclusion is rooted in concerns over both the Executive's traditional prosecutorial discretion, see id. at 140, as well as the "concomitant chilling effect" that might impair presidential advice if the possibility of criminal*

*prosecution loomed over the President's close advisors, see id. at 142. Significantly, OLC also determined that "the same reasoning that suggests that the statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well." Id. at n. 42. Thus, neither criminal prosecution nor inherent contempt could be employed against a recalcitrant executive branch official, as OLC saw it.*

*Instead, "Congress [can] obtain a judicial resolution of the underlying privilege claim and vindicate its asserted right to obtain any documents by a civil action for enforcement of a congressional subpoena." Id. at 137. As OLC put it, a civil action would be superior because:*

*Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function . . . [and] [a] civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents, not at inflicting punishment on an individual who failed to produce them. Thus, even if criminal sanctions were not available against an executive official who asserted the President's claim of privilege, Congress would be able to vindicate its legitimate desire to obtain documents if it could establish that its need for the records outweighed the Executive's interest in preserving confidentiality. Id. ...*

*A 1986 OLC opinion authored by Assistant Attorney General Charles Cooper reached the same conclusion. See Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act, 10 U.S. Op. Off. Legal Counsel 68 (1986) (hereinafter "Cooper OLC Opinion"). In that opinion, OLC restated its position that Congress may institute "a civil suit seeking declaratory enforcement of [a] subpoena." Id. at 83. Likewise, OLC indicated that although inherent contempt is theoretically available to Congress and could ultimately be challenged by the executive branch through a writ of habeas corpus brought by the detained official, "it seems most unlikely that Congress could dispatch the Sergeant at-Arms to arrest and imprison an*

*Executive Branch official who claimed executive privilege." Id. at 86. Committee on Judiciary v. Miers, 558 F. Supp. 2d 53, 75-77 (D.D.C. 2008).*

35. In this case, the highly partisan Committee and Democrat-controlled Congress in all likelihood believe they have a friend in a Democrat Attorney General who will help them use the criminal prosecution alternative to apply maximum coercive pressure in support of their punitive ends.  Yet, this is clearly not the less burdensome alternative.

36. *Miers* makes clear that a civil suit in this case does indeed represent a justiciable controversy and a far less burdensome alternative than a criminal prosecution involving a contempt of Congress charge against me, with all its accompanying economic coercion, psychological terror, and other punishments. That the Committee and its members and the Democrat majority in the House instead pursued the single most burdensome option of criminal prosecution confirms the bill of attainder nature and punitive objective of their coercive tactics.  In this way, the Committee and its members along with the Democrat-controlled House miserably fails Test Three of *Nixon v. Administrator of General Services* and thereby confirms their legislative acts represent bills of attainder.

37. In summary, H. Res. 1037 and the Committee's Report along with the subpoena issued by the Committee that constitutes the basis for its contempt charge, together and separately violate the Bills of Attainder Clause of the Constitution.  H. Res. 1037 should thereby be ruled by this Court as an invalid legislative act, both the Committee subpoena and Committee Report should likewise be ruled illegal and unconstitutional, and the U.S. Attorney for the District of Columbia should be enjoined from any further action in this matter.

**An Incumbent President Cannot Waive the Executive Privilege of His Predecessor or Testimonial Immunity of Senior Advisers Not Serving that Incumbent**

1.      We come now to more squarely address the third major controversy in this case: What rights, if any, does an incumbent president have to strip away executive privilege from a predecessor or other former presidents and/or to waive testimonial immunity for the senior advisors of a predecessor or other former presidents?  Because this controversy is so central to this case, because there is no settled law, and because it has such broader implications for the future viability of executive privilege and testimonial immunity as positive forces for effective presidential decision-making, it is a controversy ripe for judicial review.

2.      That this controversy is even a controversy stunned me when I first heard of it. While I am not a lawyer, I'm not without legal expertise.  One of my areas of expertise in economics for which I have a Ph.D. in is regulatory economics; and this sub-field requires a keen understanding of regulatory law.  I am therefore not without experience in reading case law and parsing legal arguments, and I have also published numerous articles in law journals.[123] When I was made aware that the Committee was going to try to circumvent my duties and obligations under the executive privilege invoked by President Trump and deny me the protections of testimonial immunity by having President Biden strip Trump and myself of these bulwarks of presidential decision-making, I began reading what little case law there is about the viability of such a blatant end run around due process. *Comm. On Judiciary of U.S. House of Representatives v. McGahn*, 951 F.3d 510, 518 (D.C. Cir. 2020) ("In such disputes, we would have few authorities to guide us—sparse constitutional text, no statute, a handful of out-of-context cases, and a set of more-or-less ambiguous historical sources. *Cf. Youngstown*, 343 U.S. at 634, 72 S.Ct. 863 (Jackson, J., concurring) ("A judge ... may be surprised at the poverty of

really useful and unambiguous authority applicable to concrete problems of executive power.").

3.     Upon review of this sparse and anything but settled law, I didn't know whether to laugh at the absurdity of the attempted legal end run of the Committee and White House or cry at how low the Democrats appeared to be willing to stoop that they would be willing to wreck both executive privilege and testimonial immunity as their means to achieve the end of Donald Trump and advisers like me.

4.     The tradition and institution of executive privilege dates back to the days of George Washington, who saw immediately the separation of powers dangers inherent in a legislative branch given free reign to meddle in the affairs of the executive branch.

5.     The *Legal Information Institute* defines executive privilege as "the power of the President and other officials in the executive branch to withhold certain forms of confidential communication from the courts and the legislative branch[124] while Senate.gov sees executive privilege "as a collection of different rights, united by the general principle that the president and key advisers must be able to have internal discussions without fear of exposure."[125]

6.     *Ala. Educ. Ass'n v. Bentley* likewise notes: "Executive privilege "refers to a doctrine under which "documents from a former or an incumbent President [or, arguably, the chief executive of a state government] are presumptively privileged." *United States v. Poindexter,* 727 F. Supp. 1501, 1505 (D.D.C. 1989) (citing *United States v. Nixon,* 418 U.S. 683, 708-13 (1974)  *Ala. Educ. Ass'n v. Bentley*, Civil Action No. CV-11-S-761-NE, at *26 (N.D. Ala. Jan. 7, 2013).  However, this definition is too limiting as it excludes the private conversations between and among presidents and advisers for which there are no "documentary materials," as defined by the Presidential Records Act.[126]  [emphasis added]

7.     The common legal thread in each of these definitions is that that the institution of

executive privilege is critical to effective presidential decision-making as executive privilege (along with the companion institution of testimonial immunity) provide necessary shields to foster the kind of candor that must exist among the president and his most senior advisors to promote the most effective presidential and executive branch decision-making possible.

8.     As *United States v. Nixon* notes: "A President and those who assist him must be free to explore alternatives in the process of shaping polices and making decisions and to do so in a way many would be unwilling to express except privately." *Mazars, 140 S. Ct. at 2032* further notes that the privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch" while *Nixon v. Administrator of General Services* opines that executive privilege "is necessary to provide the confidentiality required for the President's conduct of office" because, "[u]nless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Nixon v. Administrator of General Services*, 433 U.S. 425, 448-49 (1977)

9.     It follows from this principle that the more executive privilege (and testimonial immunity) are <u>qualified,</u> the less  candor there is likely to be in the conduct of official White House business and the less optimal presidential decision-making will likely be.  Yet settled law is sparse as regards how executive privilege should be qualified. This is partly a function of the relatively few cases that have addressed matters of executive privilege. As *Comm. on Judiciary v. McGahn* notes: "To be sure, there was an uptick in Congress' use of its investigative power in the late nineteenth century, and yet, as DOJ emphasizes, 'there were [still] very few cases dealing with the investigative power.'" *Id.* at 194, <u>77 S.Ct. 1173</u>. *Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 181 (D.D.C. 2019).

10.     As previously noted in *Trump v. Mazurs*, much of the time, disputes over executive privilege between the executive and legislative branches have been negotiated in the "hurly-burly" of the political arena and therefore case law on this subject is sparse:   "The question presented is whether the subpoenas exceed the authority of the House under the Constitution. Historically, disputes over congressional demands for presidential documents have not ended up in court. Instead, they have been hashed out in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel).  *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2029 (2020).

11.     The few generally accepted principles considered to be settled law date back to the *United States v. Nixon* a.k.a. the Watergate scandal and *Nixon v. Administrator of General Services*.

12.     The Watergate Scandal opened the door to the qualification of privilege <u>in the presence of criminal conduct</u>, e.g., the privilege is waived if the communications are criminal in nature.   Yet, this qualification would indeed quickly be "cabined" to the criminal sphere. *Committee on Judiciary v. Miers* notes: "*Nixon* involved a criminal proceeding but we soon rejected a generalized claim of absolute executive privilege in civil litigation as well. *See Dellums* , <u>561 F.2d at 245–46</u>." *Comm. On Judiciary of U.S. House of Representatives v. McGahn*, 951 F.3d 510, 540 n.11 (D.C. Cir. 2020)

13.     *United States v. Nixon* also helped confirm that "the Judiciary is the ultimate arbiter when it comes to claims of executive privilege" while "the *Miers* opinion stands for the proposition that     courts     have     federal     jurisdiction     over subpoena enforcement

disputes between the Legislature and the Executive branch, and that such disputes are justiciable…." *Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 173 (D.D.C. 2019).

14.    Note that *Comm. on Judiciary v. McGahn* is a highly flawed opinion that was overturned on appeal.  Comm. On Judiciary of U.S. House of Representatives v. McGahn, 951 F.3d 510 (D.C. Cir. 2020).  Nothing in it qualifies as precedent.

15.    *Nixon v. Administrator of General Services* likewise makes clear that incumbent presidents are not the only ones who can claim executive privilege: "We reject the argument that only an incumbent President may assert such claims and hold that appellant, as a former President, may also be heard to assert them." *Nixon v. Administrator of General Services*, 433 U.S. 425, 439 (1977).  Yet this case also put forth the dubious proposition based on a District Court ruling – and again cast within the shadow of possible criminal activity -- that the claims of a former president "carries much less weight than a claim asserted by the incumbent himself." *Id.*, at 345." *Nixon v. Administrator of General Services*, 433 U.S. 425, 448 (1977).

16.    *United States v. Nixon* also helped set the precedent that the applicability of executive privilege should be decided on a case-by-case basis by weighing the need to protect confidentiality and preserve executive privilege against the need for the administration of justice.[127]  Yet, as previously noted with the "cabined" reference, this principle itself was again limited by the context of the case itself with respect to the criminality involved.  "[T]he Supreme Court in United States v. Nixon explicitly cabined its opinion to the criminal arena. See 418 U.S. at 711 n. 19 ("We address only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials.")." *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 72 (D.D.C. 2008).

[emphasis added]

17.     Of course, it may be arguable that neither presidents nor their advisors should be shielded in ways that would allow criminal conduct to flourish. But it must be at this criminal water's edge where the qualification of executive privilege and testimonial immunity by both the Committee and the White House must stop if these two important bulwarks of effective presidential decision-making are to be maintained.  At this water's edge, there is not a scintilla of settled law over the controversy as to whether an incumbent president can waive the privilege of his or her predecessor and/or the testimonial immunity of that predecessor's senior advisers. To recap, *Comm. On Judiciary of U.S. House of Representatives v. McGahn*, 951 F.3d 510, 518 (D.C. Cir. 2020) ("In such disputes, we would have few authorities to guide us—sparse constitutional text, no statute, a handful of out-of-context cases, and a set of more-or-less ambiguous historical sources. *Cf. Youngstown*, 343 U.S. at 634, 72 S.Ct. 863 (Jackson, J., concurring) ("A judge ... may be surprised at the poverty of really useful and unambiguous authority applicable to concrete problems of executive power.").

18.     While the Committee and its lawyers are free to make whatever arguments they might want in support Joe Biden's actions in this case, the ideas that a sitting president can strip his predecessor or former presidents of executive privilege and the president's most senior advisors of testimonial immunity are both fanciful and absurd on their face. It is even more fanciful and absurd in this case when the sitting president, a Democrat, is seeking to strip the executive privilege of the man he allegedly beat in the 2020 presidential election, Republican Donald Trump, even as both Biden and the Democrat Party are doing everything within their substantial political powers not just to end the presidential career of Donald Trump but to bury any challenges to the fairness and integrity of a 2020 election that remains hotly disputed.

19.     Stripped of rhetoric, allowing a sitting president of one political party to strip a predecessor of another political party of executive privilege and likewise strip senior White House advisors serving that predecessor of their testimonial immunity – regardless of whether this is done under the alluring banner of the national interest – is arguably the most extreme and dangerous form of qualifying executive privilege and testimonial immunity. If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would turn executive privilege and testimonial immunity into partisan ping-pong balls and deal a mortal blow to the critical functions each are supposed to serve in our Republic: (1) help uphold the principle of separation of powers; and (2) provide for optimum candor in presidential decision-making.

20.     Even if such instances of an incumbent president waiving the privilege of his predecessor were seen as rare and occurring in only extreme circumstances as *Dellums v. Powell* alludes to, if this were settled law, it would be enough to mortally wound privilege as an essential ingredient of effective presidential decision-making. This is particularly so within the context of this case where it is clear that the Committee has, as previously noted, in all probability either explicitly or tacitly colluded with the incumbent president to have the Trump privilege waived so the Committee can then have its judicial function and bill of attainder ways with President Trump and his most senior advisors. Here, *Dellums v. Powell* has it right when it opines: [T]hose on whom a President relies for advice <u>would be foolish indeed</u> to discuss the demands of executive decision-making with candor, when every proposal would be subject to public disclosure through civil discovery. *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977). [emphasis added]

21.     Here, however, *Dellums v. Powell* has it wrong when it argues that it is such a rare

"infrequent" occurrence in which privilege and immunity might be waived that it would not materially affect the risk calculus of future senior White House advisers: "We cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution." *Dellums v. Powell*, 561 F.2d 242, 247 n.12 (D.C. Cir. 1977) [emphasis added] and "[T]he need for confidentiality is in large measure secured and protected by the relatively infrequent occasions when an assertion of the privilege may be overcome." *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977).

22.   The clear problem with this "relatively infrequent occasions" argument in the context of this case is that the current situation clearly indicates a long term "repeatable game" pattern of partisan abuse of the House's investigatory powers over more than five-year period rather than a "one and done" rare event based on extraordinary circumstances occurring in, as *Dellums v. Powell* qualifies it, the "context of a criminal prosecution." *Dellums v. Powell*, 561 F.2d 242, 247 n.12 (D.C. Cir. 1977).   (To recap, this pattern of partisan abuse by the Committee and its members along with Speaker Pelosi was firmly established in a previous section of this brief.)

23.   From my perspective as a trained economist, and through the lens of strategic game theory, I see the punitive legislative acts and chronic pattern of partisan abuses associated with the Committee and its members over a more than five-year period indeed as a "repeatable game" of gotcha and punishment rather than a one-off rare event that that threatens to reduce the institutions of executive privilege and testimonial immunity to ping pong balls of partisan politics.  In this strategic game, whichever party controls both the House of Representatives and White House will effectively weaponize Congress's investigatory powers in ways designed to:

(1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office.

24.     As partisans in the Congress wield their investigatory powers, they will enlist whatever friendly president might be in the White House to strip the executive privilege of former presidents and the testimonial immunity of former senior White House advisors; and it will all be done under the false flags of national emergency and national security. In this case, if the Committee and Joe Biden are able to pull this deadly game off and effectively establish the principle that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024.  In fact, I don't need to imagine this repeat of the strategic game.  If I'm not dead or in prison, I will "tit for tat" lead the charge.

25.     In summary, if the goal is to preserve executive privilege and testimonial immunity to promote optimal presidential decision-making through maximum candor, than the idea that a former president's entitlement to such privilege is somehow of a "lesser weight" than a present president is indeed fanciful and absurd   Any settled law that institutionalizes a revolving partisan door for the waiving of testimonial immunity and executive privilege will end both immunity and privilege as essential elements of effective presidential decision-making. Because this is so, the time is ripe for this court to address this controversy.  By ruling in my favor, the court will lift the burdensome punishments now being inflicted upon me and provide the appropriate relief.

26.     I note in closing that as I came to this particular controversy, it was settled law that executive privilege is not my privilege to waive. Absent a waiver of that privilege by President Trump, it was – and remains -- my duty not to comply with the Committee's subpoena.

Importantly, and I repeat, <u>I have also made it clear publicly that I would abide by any decision made by President Trump in this matter</u>.[128]

27.    Instead of negotiating directly with President Trump and his attorneys as settled law demanded, the Committee and its members used the Biden unsettled law waiver of privilege and immunity to try to effectively strip me of any legal right, duty, or constitutional obligation I might have had to fail to comply with their subpoena and, after I failed to comply with what I believed their unlawful subpoena, the Committee and Democrat-controlled House pursued <u>the</u> most burdensome and punitive alternative of a criminal contempt charge rather than the less burdensome options of negotiating the privilege with President Trump or filing a civil suit.

28.    As a result, I was put in the untenable position in which the president I served under has invoked a privilege that a president that I did <u>not</u> serve under has appeared to waive. Given that it was my sworn duty to uphold the law and abide by the Constitution and that it remains my belief that there is no settled law to support the acts of the Biden White House and Committee and given that I believe the law strongly leans in my favor, I had – and have -- no other honorable choice than to fail to comply with the Committee's subpoena.  In the absence of even a scintilla of settled law in this matter, it would be both unlawful and dishonorable for me to consider President Trump's privilege and my own testimonial immunity waived just because Joe Biden says they are.

29.    I therefore ask this court to dive into the deep end of this pool and firmly address a controversy that is ripe for adjudication and thereby settle the law in this matter.

**The Plaintiff's Testimonial Immunity is Absolute and His Failure to Comply With a Congressional Subpoena Cannot Be the Legal Basis for a Contempt of Congress Charge.**

1.      Congress cannot lawfully hold the Plaintiff in contempt of Congress for failure to comply with a subpoena that compels him to testify before the Committee because, under long-standing Department of Justice policy, the Plaintiff has absolute testimonial immunity as a senior White House official and has a duty to his country and the executive branch not to comply with said subpoena.

2.      The right of a senior White House official to testimonial immunity is conceptual and legally distinct from executive privilege.  The Office of Legal Counsel in the Department of Justice (OLC) has long contended, dating back more than 50 years, that such immunity is absolute; and there is no settled law to the contrary.  Memorandum For Pat A. Cipollone Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.  As OLC notes:

> *This testimonial immunity is distinct from, and broader than, executive privilege. Like executive privilege, the immunity protects confidentiality within the Executive Branch and the candid advice that the Supreme Court has acknowledged is essential to presidential decision-making... But the immunity extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself. In this regard, the President's immediate advisers are constitutionally distinct from the heads of executive departments and agencies, whose offices are created by acts of Congress, whose appointments require the Senate's advice and consent, and whose responsibilities entail the administration of federal statutes. Those officers can and do testify before Congress. The President's immediate advisers, however, exercise no*

*statutory authority and instead act solely to advise and assist the President. Their independence from Congress reflects that of the President.*

*Since the 1970s, this Office has consistently advised that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee" on matters related to their official duties. Memorandum for All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice, from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, Re: Executive Privilege at 5 (May 23, 1977) ("Harmon Memorandum"); see also Rehnquist Memorandum at 7 ("The President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis—should be deemed absolutely immune from testimonial compulsion by a congressional committee."). Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations.*[129]

3.      If the testimonial immunity of senior White House officials is absolute and exists as an institution to provide for unconstrained candor in communications between an adviser and the president or other advisers, then it can't be waived by the adviser and certainly not by an incumbent president seeking to unlawfully strip his predecessor of both executive privilege and the right to grant testimonial immunity.

4.      Only the courts have the power to waive testimonial immunity on a case by case basis and, given the high stakes for the Republic involved, the courts should tread extremely lightly. Indeed, if the purpose of testimonial immunity is to provide the confidence senior White House advisers need to speak in complete candor to the president and other senior advisers, then any erosion of such testimonial immunity protection must inevitably lead to a reduction in such

candor and therefore less optimal decision-making.

5.      I propose the following test for this court to consider: Would a current White House adviser be significantly less likely to engage in the kind of candor necessary for effective presidential decision-making as recognized under *Nixon v. Administrator of General Services* if that adviser understands that any claim to testimonial immunity by that adviser may be waived by a president that adviser did not serve under?  If the answer is yes, then testimonial immunity must be considered absolute in this circumstance or, alternatively, waived only on a case by case basis by the courts with extreme caution.

6.      I have been put in the untenable position of choosing between conflicting privilege claims that are of constitutional origin and dimension and for which there is no settled law. Allowing a sitting president of one political party to strip a predecessor of another political party of the testimonial immunity afforded to that predecessor's senior White House advisors in the absence of possible criminal conduct -- regardless of whether this is done under the flag of the national interest -- is arguably the most extreme and dangerous form of qualifying testimonial immunity.  If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would deal a mortal blow to the critical functions that testimonial immunity are supposed to serve in our Republic.

# PRAYER FOR RELIEF

Wherefore, Plaintiff asks the Court to enter judgment in his favor and against Defendants and to order the following relief:

a.  A declaratory judgment that the Committee is neither duly authorized nor properly constituted and therefore its legislative acts, including the subpoena issued to the Plaintiff and Committee Report 117-284, are therefore *ultra vires*, unlawful, and unenforceable;

b.  A declaratory judgment that the Committee's subpoena issued to the Plaintiff, the Committee's Report 117-284, and H.Res. 1037 all represent legislative acts that, as revealed by the legislative history, violate the principle of separation of powers in their simultaneous and unlawful pursuit of a judicial function over and above a facially valid legislative function and are therefore *ultra vires*, unlawful, and unenforceable;

c.  A declaratory judgment that the Committee's subpoena issued to the Plaintiff, the Committee's Report 117-284, and H.Res. 1037 violate the constitutional proscription against bills of attainder and are therefore *ultra vires*, unlawful, and unenforceable;

d.  A declaratory judgment that the Committee subpoena issued to the Plaintiff improperly compels testimony of a senior executive official;

e.  An injunction against the U.S. Attorney for the District of Columbia enjoining him from further proceeding against the Plaintiff "in the manner and form provided by law" as H.Res. 1037 recommends;

f.  An injunction against the U.S. Attorney General enjoining him from enforcing Grand Jury Subpoena #GJ2022052590979 USAO #2022R00631 dated May 26, 2022 which is derivative of the fruit of the poison tree *ultra vires,* illegal, and

unenforceable Committee subpoena dated February 9, 2022; and

g.   A declaratory judgment against President Joe Biden that he does not have the legal authority to waive any executive privilege or testimonial immunity invoked by his predecessor in this case.

WHEREFORE, the Plaintiff respectfully requests a jury trial and that the Court enter judgment in his favor and against the Defendants.

Respectfully Submitted,

Date:   ~~June 1, 2022~~   *Mag 31, 2022*

Peter Navarro

Plaintiff, *pro se*

801 Pennsylvania Ave NW, Unit 1021

Washington, DC 20004

pknavarro@protonmail.com

202-489-7479

# ENDNOTES

[1] Hoyer, Stenny, "H.Res.8 - Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes," U.S. Congress, January 4, 2021. H.Res.8 - 117th Congress (2021-2022): Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes. | Congress.gov | Library of Congress

"This resolution establishes the rules of the House of Representatives for the 117th Congress by adopting and modifying the House rules from the 116th Congress. Changes from the rules for the previous Congress include measures to facilitate the operation of Congress during the ongoing COVID-19 (i.e., coronavirus disease 2019) pandemic.

The resolution makes the Office of Diversity and Inclusion permanent, revises language in the rules to be gender-inclusive and continues requirements to protect congressional employees from harassment and discrimination. The resolution also implements measures to protect whistle-blowers and increase congressional transparency.

The resolution authorizes necessary amounts for the Committee on House Administration to resolve contested elections. Additionally, the Clerk of the House of Representative must establish a process for House Members to indicate their support for Senate-passed measures that have been received by the House, including maintaining a publicly available list of Members supporting each measure.

The chair of the Committee on the Budget may adjust an estimate concerning the fiscal impact of legislation to exempt the budgetary effects of measures to prevent, prepare for, or respond to economic or public health consequences resulting from the COVID-19 pandemic, as well as measures to prevent, prepare for, or respond to economic, environmental, or public health consequences resulting from climate change.

Until the Committee on Oversight and Reform has adopted rules, the chair of the Select Subcommittee on the Coronavirus Crisis may issue subpoenas related to its investigation into political interference in the response to the coronavirus pandemic at the Department of Health and Human Services and the Centers for Disease Control and Prevention.

The resolution also reauthorizes specified commissions, offices, and committees, and establishes a Select Committee on Economic Disparity and Fairness in Growth."

[2] The "power of inquiry—with process to enforce it" is "an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty* , 273 U.S. 135, 161, 47 S.Ct. 319, 71 L.Ed. 580 (1927), at 174, 47 S.Ct. 319.

[3] For example, *Watkins v. United States* insists that "testing the motives of committee members...is not our function" and furthermore, "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served. *Watkins v. United States*, 354 U.S. 178 (1957). Barenblatt asserts "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose [function] is being served." *Barenblatt v. United States*, 360 U.S. 109, 132-33 (1959).  "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959).  As recently as 2019, Trump v Mazur opines "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Id.* at 127, 132, 79 S.Ct. 1081.  *Trump v. Mazars U.S., LLP*, 940 F.3d 710, 721 (D.C. Cir. 2019)

[4] Transition Integrity Project, "Preventing a Disrupted Presidential Election and Transition," August 3, 2020. https://s3.documentcloud.org/documents/7013152/Preventing-a-Disrupted-Presidential-Election-and.pdf

[5] Ball, Molly, "The Secret History of the Shadow Campaign That Saved the 2020 Election," *Time Magazine*, February 4, 2021. https://time.com/5936036/secret-2020-election-campaign/

[6] Navarro, Peter, "The Navarro Report," November 2020 – January 2021. https://www.dropbox.com/s/584r7xtnngauc4t/The%20Navarro%20Report%20Vol%20I%2C%20II%2C%20III%20-%20Feb.%202%2C%202021.pdf?dl=0

[7] Axios/Momentive, "January 6th Revisited," January 2022. https://www.surveymonkey.com/curiosity/axios-january-6-revisited/

NPR/Ipsos, "Public Poll Findings and Methodology," December 2021. https://www.ipsos.com/sites/default/files/ct/news/documents/2022-01/Topline-NPR-Ipsos-poll.pdf

[8] Electronic email from Rep. Bennie Thompson to Peter Navarro, February 9, 2022 transmitting subpoena

[9] Morris, Chris, "10 iconic American companies owned by Chinese investors," *CNBC*, May 11, 2017. https://www.cnbc.com/2017/05/11/10-iconic-american-companies-owned-by-chinese-investors.html?msclkid=d9761daed16b11ec9b17634761de7e42

[10] Hoft, Joe, "Jan 6 Remembered: Ignored By Media And FBI: Antifa-BLM Activists Are Posting Photos and Bragging Online About Storming US Capitol on Jan. 6," *The Gateway Pundit*, January 6, 2022. https://www.thegatewaypundit.com/2022/01/jan-6-remembered-ignored-media-fbi-antifa-blm-activists-posting-photos-bragging-online-storming-us-capitol-jan-6/

[11] Williams, Jordan, "FBI had informant in crowd during Capitol riot: report," The Hill, September 25, 2021. https://thehill.com/policy/national-security/fbi/573915-fbi-had-informant-in-crowd-during-capitol-riot-report/

[12] McFarlane, Scott, et al., "House January 6 committee refers contempt charges for Navarro and Scavino," *CBS News*, March 28, 2022. "In short: [Dan Scavino and Peter Navarro] played key roles in the ex-President's efforts to overturn the results of the 2020 election…" (Rep. Bennie Thompson) https://www.cbsnews.com/news/peter-navarro-dan-scavino-house-january-6-committee-refers-contempt-charge/

Amri, Farnoush, et al., "Capitol siege Steve Bannon Politics Bennie Thompson Crime Congress Dan Scavino Peter Navarro Donald Trump Subpoenas Jan. 6 committee votes to hold Scavino, Navarro in contempt," *AP News*, March 29, 2022. https://apnews.com/article/capitol-siege-steve-bannon-subpoenas-dan-scavino-peter-navarro-3247f6b7a644ff3e2c6f14d41f6cd0c8

"He hasn't been shy about his role in efforts to overturn the results of the 2020 election and has even discussed the former President's support for those plans…" (Rep. Bennie Thompson)

[13] Navarro, Peter, "In Trump Time: My Journal of America's Plague Year," *All Seasons Press*, November 2, 2021. https://www.amazon.com/gp/product/1737478501?pf_rd_r=EH88QR628VHK7JAYF7MP&pf_rd_p=1ab92b69-98d7-4842-a89b-ad387c54783f&pd_rd_r=6e00e6fc-a73a-4f19-9b0e-e6a63cc1ef41&pd_rd_w=Z7psz&pd_rd_wg=58b0Z&ref_=pd_gw_unk

[14] 3 U.S. Code § 15, "Counting electoral votes in Congress." https://www.law.cornell.edu/uscode/text/3/15

[15] Martin, Alison, "This Week in History: JFK and the Stolen Election," *Chicago Sun Times*, December 16, 2020. https://chicago.suntimes.com/2020/12/16/22176920/jfk-stolen-1960-election-chicago-illinois

[16] Thompson, Bennie, "Subpoena to Peter Navarro," *U.S. House of Representatives*, February 23, 2022. https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HMTG-117-IJ00-20220328-SD002.pdf

[17] Thompson, Bennie, "Subpoena to Peter Navarro," *U.S. House of Representatives*, February 23, 2022. https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HMTG-117-IJ00-20220328-SD002.pdf

[18] A fourth choice would have been piecemeal negotiation over what the Committee wanted but after watching the spectacle with Meadows, I wanted no part of that.

[19] Thompson, Bennie, "Resolution Recommending That The House Of Representatives Find Peter K. Navarro And Daniel Scavino, Jr., In Contempt Of Congress For Refusal To Comply With Subpoenas Duly Issued By The Select Committee To Investigate The January 6th At- Tack On The United States CapitoL," U.S. House of Representatives, April 4, 2022. , https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HRPT-117-NA.pdf

[25] The prison term for this offense makes it a Class A misdemeanor. 18 U.S.C. § 3559(a)(6). By that classification, the penalty for contempt § 192 increased from $1,000 to $100,000. 18 U.S.C. § 3571(b)(5).

[20] Borger, Gloria, et al., "CNN Exclusive: Ivanka Trump talked to January 6 committee about what was happening inside White House that day, panel chairman says," *CNN*, May 2, 2022. https://www.cnn.com/2022/05/02/politics/ivanka-trump-january-6-committee-bennie-thompson/index.html

[21] Borger, Gloria, et al., "CNN Exclusive: Ivanka Trump talked to January 6 committee about what was happening inside White House that day, panel chairman says," *CNN*, May 2, 2022. https://www.cnn.com/2022/05/02/politics/ivanka-trump-january-6-committee-bennie-thompson/index.html

[22] Yokely, Eli, "Voters Don't Necessarily Think Pleading the Fifth Implies Guilt, But It Varies by Party, *Morning Consult*, May 16, 2018. https://morningconsult.com/2018/05/16/voters-dont-necessarily-think-pleading-the-fifth-implies-guilt-but-it-varies-by-party/#:~:text=51%25%20of%20registered%20voters%20said,independents%20who%20said%20the%20same.

[23] Hains, Tim, "Jan. 6 Committee Chairman Bennie Thompson: If You Plead The Fifth, You're "Part & Parcel Guilty," *RealClear Politics*, December 2, 2021. https://www.realclearpolitics.com/video/2021/12/02/january_6_committee_chairman_bennie_thompson_if_you_plead_the_fifth_youre_part_and_parcel_guilty.html

[24] Su, Jonathan Letter of Feb 28, 2022.

[25] See, for example: Broadwater, Luke, "Jan. 6 Panel Warns of Contempt Charges Against Two More Trump Allies," *New York Times*, March 24, 2022.  https://www.nytimes.com/2022/03/24/us/politics/peter-navarro-dan-scavino-contempt-charges.html

[26] Kaplan, Rebecca, "House committee advances contempt motion against Navarro and Scavino," *CBS News*, April 4, 2022. https://www.cbsnews.com/news/peter-navarro-dan-scavino-contempt-motion-advances-to-full-house/

[27] "Roll Call 118: Bill Number: H. Res. 1037," *Clerk of the U.S. House of Representatives*, April 6, 2022. https://clerk.house.gov/Votes/2022118.

28 Hoyer, Steny, "H.Res.8 - Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes," *U.S. Congress*, January 4, 2021. H.Res.8 - 117th Congress (2021-2022): Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes. | Congress.gov | Library of Congress.

"This resolution establishes the rules of the House of Representatives for the 117th Congress by adopting and modifying the House rules from the 116th Congress. Changes from the rules for the previous Congress include measures to facilitate the operation of Congress during the ongoing COVID-19 (i.e., coronavirus disease 2019) pandemic.

The resolution makes the Office of Diversity and Inclusion permanent, revises language in the rules to be gender-inclusive, and continues requirements to protect congressional employees from harassment and discrimination. The resolution also implements measures to protect whistle-blowers and increase congressional transparency.

The resolution authorizes necessary amounts for the Committee on House Administration to resolve contested elections. Additionally, the Clerk of the House of Representative must establish a process for House Members to indicate their support for Senate-passed measures that have been received by the House, including maintaining a publicly available list of Members supporting each measure.

The chair of the Committee on the Budget may adjust an estimate concerning the fiscal impact of legislation to exempt the budgetary effects of measures to prevent, prepare for, or respond to economic or public health consequences resulting from the COVID-19 pandemic, as well as measures to prevent, prepare for, or respond to economic, environmental, or public health consequences resulting from climate change.

Until the Committee on Oversight and Reform has adopted rules, the chair of the Select Subcommittee on the Coronavirus Crisis may issue subpoenas related to its investigation into political interference in the response to the coronavirus pandemic at the Department of Health and Human Services and the Centers for Disease Control and Prevention.

The resolution also reauthorizes specified commissions, offices, and committees, and establishes a Select Committee on Economic Disparity and Fairness in Growth."

[29] Pelosi, Nancy, "H.Res.503 - Establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol," *U.S. Congress*, June 28, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/503?q=%7B%22search%22%3A%5B%22h.res+503+117%22%2C%22h.res%22%2C%22503%22%2C%22117%22%5D%7D&s=1&r=8

[30] Sprunt, Barbara, "Here Are The 9 Lawmakers Investigating The Jan. 6 Capitol Attack," *NPR*, July 27, 2021. https://www.npr.org/2021/07/27/1020713409/here-are-the-9-lawmakers-investigating-the-jan-6-capitol-attack
[31] Beavers, Olivia, et al., "McCarthy makes his 5 GOP picks for Jan. 6 select committee," *Politico*, July 19, 2021. https://www.politico.com/news/2021/07/19/mccarthy-zeroes-in-on-five-gop-members-for-jan-6-select-committee-500201

[32] The composition of the House Select Committee to Investigate the January 6th Attack on the United States Capitol is governed by Section 2 of H. Res. 503. Section 2(a) states "Appointment Of Members.—The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503 117th Cong. (2021).

[33] Pelosi, Nancy, "Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol," July 21, 2021. https://www.speaker.gov/newsroom/72121-2

[34] The "power of inquiry—with process to enforce it" is "an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty* , 273 U.S. 135, 161, 47 S.Ct. 319, 71 L.Ed. 580 (1927), at 174, 47 S.Ct. 319.

[35] *McGrain v. Daugherty*, 273 U.S. 135 (1927). Each house of Congress has power, through its own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution. P. 160. 7

[36] For example, *Watkins v. United States* insists that "testing the motives of committee members...is not our function" and furthermore, "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served. *Watkins v. United States*, 354 U.S. 178 (1957). Barenblatt asserts "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose [function] is being served." *Barenblatt v. United States*, 360 U.S. 109, 132-33 (1959). "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959). As recently as 2019, Trump v Mazur opines "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Id.* at 127, 132, 79 S.Ct. 1081. *Trump v. Mazars U.S., LLP*, 940 F.3d 710, 721 (D.C. Cir. 2019)

[37] "Investigations, whether by standing or special committees, are an established part of representative government. Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province. To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive. The present case does not present such a situation. *Tenney v. Brandhove*, 341 U.S. 367, 377-78 (1951). In this case, it is painfully and glaringly obvious the Speaker and the Committee and its members have persistently sought to exercise judicial power.

[38] In the light of the Committee's history and the repeated extensions of its life, as well as the successive appropriations by the House of Representatives for the conduct of its activities, its legislative authority and that of the Subcommittee to conduct the inquiry under consideration here is unassailable; and House Rule XI, 83d Congress, which defines the Committee's authority, cannot be said to be constitutionally infirm on the score of vagueness. *Watkins* v. *United States*, 354 U.S. 178, distinguished. Pp. 116-123.
[39] (a) Rule XI has a "persuasive gloss of legislative history" which shows beyond doubt that, in pursuance of its legislative concerns in the domain of "national security," the House of Representatives has clothed the Committee with pervasive authority to investigate Communist activities in this country. Pp. 117-121.

[40] Thompson, Bennie, et al., "To establish the National Commission to Investigate the January 6 Attack on the United States Capitol Complex, and for other purposes," *U.S. Congress*, May 14, 2021. https://www.govinfo.gov/content/pkg/BILLS-117hr3233ih/pdf/BILLS-117hr3233ih.pdf

[41] (1) a "Chairperson" "appointed jointly by the Speaker of the House of Representatives and the majority leader of the Senate"; (2) a "Vice Chairperson" "appointed jointly by the minority leader of the House of Representatives and the minority leader of the Senate"; (3) "two members . . . appointed by the Speaker of the House of Representatives"; (4) "two members . . . appointed by the minority leader of the House of Representatives"; (5) "two members . . . appointed by the majority leader of the Senate"; and (6) "two members . . . appointed by the minority leader of the Senate." Because Democrats control both chambers in the current Congress, the Commission would have included five members appointed by Democrats and five members appointed by Republicans.

[42] "Roll Call 154 | Bill Number: H. R. 3233," *Clerk of the U.S. House of Representatives*, May 19, 2021. https://www.congress.gov/bill/117th-congress/house-bill/3233/all-actions?overview=closed&q=%7B%22roll-call-vote%22%3A%22all%22%7D

[43] "Roll Call 154 | Bill Number: H. R. 3233," *Clerk of the U.S. House of Representatives*, May 19, 2021. https://www.congress.gov/bill/117th-congress/house-bill/3233/all-actions?overview=closed&q=%7B%22roll-call-vote%22%3A%22all%22%7D

[44] Raskin, Jamie, "H.R.1987 - Oversight Commission on Presidential Capacity Act," U.S. Congress, April 6, 2021. https://www.congress.gov/bill/115th-congress/house-bill/1987

[45] Nadler, Jerrold, "H.Res.496 - Condemning and censuring President Donald Trump," *U.S. Congress*, August 18, 2017. https://www.congress.gov/bill/115th-congress/house-resolution/496?s=1&r=87

[46] Nadler, Jerrold, "H.Res.496 - Condemning and censuring President Donald Trump," *U.S. Congress*, August 18, 2017. https://www.congress.gov/bill/115th-congress/house-resolution/496?s=1&r=87

[47] McGovern, James "H.Res.660 - Directing certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes," *U.S. Congress,* October 19, 2019. https://www.congress.gov/bill/116th-congress/house-resolution/660

[48] McGovern, James "H.Res.660 - Directing certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes," *U.S. Congress,* October 19, 2019. https://www.congress.gov/bill/116th-congress/house-resolution/660

[49] Nadler, Jerrold, "H.Res.755 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors.," *U.S. Congress*, December 10, 2019. https://www.congress.gov/bill/116th-congress/house-resolution/755#:~:text=The%20resolution%20sets%20forth%20two,by%20the%20House%20of%20Representatives

[50] Raskin, Jamie, "H.R.8548 - Commission on Presidential Capacity to Discharge the Powers and Duties of the Office Act," *U.S. Congress*, October 9, 2020. https://www.congress.gov/bill/116th-congress/house-bill/8548?s=1&r=2

[51] Cicilline, David, "H.Res.24 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors," *U.S. Congress*, January 11, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/24

[52] Raskin, Jamie, "H.Res.21 - Calling on Vice President Michael R. Pence to convene and mobilize the principal officers of the executive departments of the Cabinet to activate section 4 of the 25th Amendment to declare President Donald J. Trump incapable of executing the duties of his office and to immediately exercise powers as acting President," *U.S. Congress*, January 12, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/21

[53] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[54] Nadler, Jerrold, "H.Res.496 - Condemning and censuring President Donald Trump," *U.S. Congress*, August 18, 2017. https://www.congress.gov/bill/115th-congress/house-resolution/496/cosponsors?r=87&s=1

[55] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696

"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[56] Berry, Deborah, "Rep. Bennie Thompson won't attend Trump's inauguration," *Clarion Ledger*, January 17, 2017. https://www.clarionledger.com/story/news/2017/01/17/thompson-not-atten-trumps-inauguration/96655990/

[57] Berry, Deborah, "Rep. Bennie Thompson won't attend Trump's inauguration," *Clarion Ledger*, January 17, 2017. https://www.clarionledger.com/story/news/2017/01/17/thompson-not-atten-trumps-inauguration/96655990/

[58] McGovern, James "H.Res.660 - Directing certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes," *U.S. Congress,* October 19, 2019.  https://www.congress.gov/bill/116th-congress/house-resolution/660/cosponsors

[59] Nadler, Jerrold, "H.Res.496 - Condemning and censuring President Donald Trump," *U.S. Congress*, August 18, 2017. https://www.congress.gov/bill/115th-congress/house-resolution/496/cosponsors?r=87&s=1

[60] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696

"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[61] Booker, Brackton, "Meet The House Managers Laying Out The Case To Impeach Donald Trump," *NPR*, February 9, 2021. https://www.npr.org/sections/trump-impeachment-trial-live-updates/2021/02/09/965914210/meet-the-house-managers-laying-out-the-case-to-impeach-donald-trump

[62] Raskin, Jamie, "H.Res.21 - Calling on Vice President Michael R. Pence to convene and mobilize the principal officers of the executive departments of the Cabinet to activate section 4 of the 25th Amendment to declare President Donald J. Trump incapable of executing the duties of his office and to immediately exercise powers as acting President," *U.S. Congress*, January 12, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/21

[63] Raskin, Jamie, "H.R.1987 - Oversight Commission on Presidential Capacity Act," U.S. Congress, April 6, 2021. https://www.congress.gov/bill/115th-congress/house-bill/1987

[64] Raskin, Jamie, "H.R.8548 - Commission on Presidential Capacity to Discharge the Powers and Duties of the Office Act," U.S. Congress, October 9, 2020. https://www.congress.gov/bill/116th-congress/house-bill/8548?s=1&r=2

[65] Siegel, Ben, et al., "Pelosi proposes experts review a president's mental fitness under 25th Amendment," *ABC News*, October 9, 2020. https://abcnews.go.com/Politics/pelosi-propose-experts-review-presidents-mental-fitness-25th/story?id=73507849

[66] Raskin, Jamie, October 8, 2016. https://www.facebook.com/raskin.jamie/photos/donald-trump-is-a-barbarian-a-bigot-a-lout-a-narcissistic-bully-and-a-serial-vio/10154554019399763/

[67] Raskin, Jamie, May 12, 2017. https://twitter.com/repraskin/status/863212423083417600

[68] Raskin, Jamie, July 16, 2018.  https://twitter.com/repraskin/status/1018987611791282177

[69] Peck, Louis, "After Senate trial, Raskin reflects on his role in Trump impeachment process," *Bethesda Magazine*, February 11, 2020. https://bethesdamagazine.com/bethesda-beat/government/after-senate-trial-raskin-reflects-on-his-role-in-trump-impeachment-process/

[70] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[71] Schiff, Adam, "Rep. Schiff's full opening argument in the Trump impeachment trial | Trump impeachment trial," January 22, 2020.

[72] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696

"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[73] Raskin, Jamie, "H.Res.21 - Calling on Vice President Michael R. Pence to convene and mobilize the principal officers of the executive departments of the Cabinet to activate section 4 of the 25th Amendment to declare President Donald J. Trump incapable of executing the duties of his office and to immediately exercise powers as

acting President," *U.S. Congress*, January 12, 2021https://www.congress.gov/bill/117th-congress/house-resolution/21/cosponsors

[74] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[75] Cicilline, David, "H.Res.24 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors," *U.S. Congress*, January 11, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors

[76] Raskin, Jamie, "H.R.1987 - Oversight Commission on Presidential Capacity Act," *U.S. Congress*, April 6, 2021. https://www.congress.gov/bill/115th-congress/house-bill/1987

[77] "Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[78] Lofgren, Zoe, "DEMOCRACY REFORM TASK FORCE." https://lofgren.house.gov/about/democracy-reform-task-force

[79] Reilly, Katie, et al., "Here Are the Democrats Boycotting Donald Trump's Inauguration," *Time Magazine*, January 17, 2017. https://time.com/4635411/democrats-boycotting-donald-trumps-inauguration/

[80] Lofgren, Zoe, "DEMOCRACY REFORM TASK FORCE." https://lofgren.house.gov/about/democracy-reform-task-force

[81] Lofgren introduces resolution urging Vice President and Cabinet to fulfill duties under 25th Amendment," U.S. Representative Zoe Lofgren, August 18, 2017. https://lofgren.house.gov/media/press-releases/lofgren-introduces-resolution-urging-vice-president-and-cabinet-fulfill-duties

[82] Lofgren, Zoe, July 14, 2019. https://twitter.com/repzoelofgren/status/1150523317482184705

[83] Lofgren, Zoe, "Lofgren Opening Statement At Hearing, "Oversight Of The U.S. Capitol Police And Preparations For And Response To The Attack Of January 6," *Committee on House Administration*, April 15, 2021. https://cha.house.gov/media/press-releases/lofgren-opening-statement-hearing-oversight-us-capitol-police-and-preparations

[84] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[85] https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors

[86] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696

"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[87] Dougherty, Kerry, "State of the Union: Where Was Rep. Elaine Luria?," February 12, 2019. https://www.kerrydougherty.com/allposts/2020/2/11/state-of-the-union-where-was-rep-elaine-luria

[88] "Congresswoman Elaine Luria Calls for Impeachment," U.S. *Representative Elaine Luria*, September 23, 2019. https://luria.house.gov/media/press-releases/congresswoman-elaine-luria-calls-impeachment

[89] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696

"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[90] Cicilline, David, "H.Res.24 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors," *U.S. Congress,* January 11, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors

[91] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[92] Aguilar, Pete, "AGUILAR ISSUES STATEMENT AHEAD OF HOUSE IMPEACHMENT VOTE," December 18, 2019. https://aguilar.house.gov/2019/12/18/aguilar-issues-statement-ahead-house-impeachment-vote/

[93] "Roll Call 604 | Bill Number: H. Res. 660," *Clerk of the U.S. House of Representatives*, October 31, 2019. https://clerk.house.gov/Votes/2019604

[94] "Roll Call 696 | Bill Number: H. Res. 755,' *Clerk of the U.S. House of Representatives*, December 18, 2019. https://clerk.house.gov/Votes/2019696

"Roll Call 17 | Bill Number: H. Res. 24," *Clerk of the U.S. House of Representatives*, January 13, 2021. https://clerk.house.gov/Votes/202117

[95] Cicilline, David, "H.Res.24 - Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors," *U.S. Congress*, January 11, 2021. https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors

[96] Murphy, Stephanie, : My Thoughts on Impeachment," May 22, 2019. https://murphy.house.gov/news/documentsingle.aspx?DocumentID=1042

[97] Select Committee on Intelligence, "RUSSIAN ACTIVE MEASURES CAMPAINGS AND INTERFERENCE IN THE 2016 U.S. ELECTION," *U.S. Senate*. https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf

[98] *United States of America v. Michael Sussman*, In the United States District Court for the District of Columbia, Case No. 1:21-cr-00582, February 14, 2022.

https://fingfx.thomsonreuters.com/gfx/legaldocs/lbpgnwxdyvq/Sussmann-response-Durham-2022-02-14.pdf

[99] Steele, Christopher, "US Presidential Election: Republican Candidate Donald Trump's  Activities In Russia And Compromising Relationship With The  Kremlin," January 11, 2017. https://archive.org/stream/TheSteelDossierTrumpIntelligenceAllegations/The%20Steele%20Dossier%20-%20Trump-Intelligence-Allegations_djvu.txt

[100] See, for example, Jarrett, Greg, "Gregg Jarrett: 'Russia hoax' was lie created by Hillary Clinton and one of the dirtiest political tricks ever," *Fox News*, October 7, 2020. Gregg Jarrett: 'Russia hoax' was lie created by Hillary Clinton and one of the dirtiest political tricks ever | Fox News

[101] George, Andre, "What Are the Consequences for Adam Schiff's Lies?," *Wall Street Journal*, May 22, 2020. https://www.wsj.com/articles/what-are-the-consequences-for-adam-schiffs-lies-11590174358

[102] Schiff, Adam, "Chairman Schiff Statement on House Intelligence Committee Investigation," *U.S. Permanent Select Committee on Intelligence*, February 6, 2022. https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=447

[103] "Thompson, Brady Announce Election Security Task Force Members," *U.S. House Homeland Securit Committee*. July 20, 2017. https://homeland.house.gov/news/press-releases/thompson-brady-announce-election-security-task-force-members

[104] Bennett, John, "Democrats Want Probe of 'Unfit' Flynn's Russia Ties," *Roll Call*, February 14, 2017. https://www.politico.com/story/2017/02/pelosi-trump-russia-23466

Pelosi, Nancy, "Pelosi Statement on First Mueller Indictments," *Office of the U.S. Speaker of the House*,  October 30, 2017.  https://pelosi.house.gov/news/press-releases/pelosi-statement-on-censure-resolution-against-president-trump

[105] Pelosi, Nancy, "Pelosi Statement on First Mueller Indictments," *Office of the U.S. Speaker of the House*, October 30, 2017.  https://pelosi.house.gov/news/press-releases/pelosi-statement-on-censure-resolution-against-president-trump

[106] Spakovsky, Hans, "Pelosi Bill to Remove President From Office Is a Needless Political Stunt," *The Heritage Foundation*, October 20, 2020. https://www.heritage.org/the-constitution/commentary/pelosi-bill-remove-president-office-needless-political-stunt

[107] Pelosi, Nancy, "Pelosi Names Members to Select Committee to Investigate January 6th Attack on the U.S. Capitol," *Office of the U.S. Speaker of the House*, July 1, 2021.  https://www.speaker.gov/newsroom/7121-0

[108] Caygle, Heather, "Pelosi tells Dems she wants to see Trump 'in prison'," *Politico*, June 5, 2019. https://www.politico.com/story/2019/06/05/pelosi-impeachment-1355435

[109] Johson, Marty, "Pelosi: Trump 'himself is a hoax'," *The Hill*, July 2, 2020. https://thehill.com/homenews/house/505679-pelosi-hits-trump-for-calling-russian-bounty-controversy-a-hoax-trump-himself/

[110] Zanona, Melanie, "Adam Kinzinger isn't ruling out a 2024 presidential bid as he considers his future after the House," *CNN*, https://www.cnn.com/2021/11/04/politics/adam-kinzinger-exit-interview/index.html

[111] Signman, Brooke, "Trump says Liz Cheney 'only upset' because he's getting US out of 'ridiculous and costly Endless Wars'," *Fox News,* July 23, 2020. https://www.foxnews.com/politics/trump-says-liz-cheney-is-only-upset-because-hes-getting-the-us-out-of-ridiculous-and-costly-endless-wars

[112] Cox, Chelsea, "Liz Cheney calls for answers, accountability on Jan. 6: 'We must know what happened'," *USA Today,* July 27, 2021. https://www.usatoday.com/story/news/politics/2021/07/27/liz-cheney-statement-jan-6-committee-probing-capitol-insurrection/5375885001/

[113] Thompson, Bennie, et al., "Thompson & Cheney Statement On Pentagon Officials' Reported Actions After January 6th," *Select Committee to Investigate the January 6thAttack on the United States Capitol,* September 16, 2021. https://january6th.house.gov/news/press-releases/thompson-cheney-statement-pentagon-officials-reported-actions-after-january-6th

[114] *John Eastman v. Bennie Thompson*, In the United States District Court for the District of Columbia, Case 1:21-cv-03273, December 14, 2021. https://www.justsecurity.org/wp-content/uploads/2021/12/january-6-clearinghouse-John-Eastman-v-Select-Committee-Verizon-Complaint-Case-1-21-cv-03273.pdf

[115] Pelosi, Nancy, "Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol," *Office of the U.S. Speaker of the House,* July 21, 2021. https://www.speaker.gov/newsroom/72121-2

[116] "Bills of pains and penalties "historically consisted of a wide array of punishments: commonly included were imprisonment, banishment, and the punitive confiscation of property by a sovereign.""

[117] As noted, both Liz Cheney and Adam Kinzinger have been censured by the Republican Party for their actions in this matter.

[118] "Stephen K. Bannon Indicted for Contempt of Congress," *U.S. Department of Justice*, November 12, 2021. https://www.justice.gov/opa/pr/stephen-k-bannon-indicted-contempt-congress?msclkid=20e1a95ccd4d11ec9d22a02aa3d42000

[119] "Mortality in the United States," December 2021. https://www.cdc.gov/nchs/products/databriefs/db427.htm#section_1

[120] This finding was also leavened by the fact that the Nixon case involved "the fair administration of criminal justice." *Nixon v. Administrator of General Services*, 433 U.S. 425, 477-78 (1977) Legislation designed to guarantee the availability of evidence for use at criminal trials is a fair exercise of Congress' responsibility to the "due process of law in the fair administration of criminal justice," *United States* v. *Nixon* , 418 U.S., at 713, and to the functioning of our adversary legal system which depends upon the availability of relevant evidence in carrying out its commitments both to fair play and to the discovery of truth within the bounds set by law. *Branzburg* v. *Hayes*, 408 U.S. 665, 688 (1972); *Blackmer* v. *United States*, 284 U.S. 421, 438 (1932); *Blair* v. *United States*, 250 U.S. 273, 281 (1919). Similarly, Congress' interest in and expansive authority to act in preservation of monuments and records of historical value to our national heritage are fully established.

[121] See, for example, Broadwater, Luke, et al., "Jan. 6 Panel Warns of Contempt Charges Against Two More Trump Allies," *New York Times,* March 24, 2020. https://www.nytimes.com/2022/03/24/us/politics/peter-navarro-dan-scavino-contempt-charges.html?msclkid=6ed093bfd17311ecba8e3e7af7cdb5bb

[122] "Report: Jan. 6 Committee Has Subpoenaed Phone Records Of More Than 100 People," *MSN*, December 7, 2021. https://www.msn.com/en-us/news/politics/report-jan-6-committee-has-subpoenaed-phone-records-of-more-than-100-people/ar-AARA6G9

[123] See: The Future of Electricity Deregulation: Lessons Learned From the California Crisis. Energy Law Journal, Summer 2003. "The Restructuring Regulator: A Guidebook and Research Agenda For the Electricity Industry," Energy Law Journal, Fall, 1995. "Fundamental Issues in Natural Resource Damage Assessments," with Richard Carson, Natural Resource Law Journal, Fall, 1988. . "How Markets For Impure Public Goods Organize," with Jeffery Dubin, Journal of Law, Economics, and Organization, Fall, 1988. . "The Legal History and Economic Implications of Oil Pipeline Regulation," Energy Law Journal, Fall, 1981, with T. Stauffer. "Financing U.S. Energy Development: An Economist's Perspective," Energy Law Journal, May 1981, Vol. 2, No. 1p

[124] "Executive Privilege," *Cornell Law School*, https://www.law.cornell.edu/wex/executive_privilege

[125] Blunt, Roy, "Defining The Limits Of Executive Privilege," *Senate Republican Policy Committee*, October 6, 2021. https://www.rpc.senate.gov/policy-papers/defining-the-limits-of-executive-privilege

[126] "The term "documentary material" means all books, correspondence, memoranda, documents, papers, pamphlets, works of art, models, pictures, photographs, plats, maps, films, and motion pictures, including, but not limited to, audio and visual records, or other electronic or mechanical recordations, whether in analog, digital, or any other form. *44 U.S. Code § 2201 – Definitions."* While official written documents are generally in the possession of the National Archivist and governed by the PRA, the PRA is silent about conversations for which there are no electronic recordings or transcripts.

[127] "Executive Privilege," *Cornell Law School*, https://www.law.cornell.edu/wex/executive_privilege and "Neither the doctrine of separation of powers nor the generalized need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances. See, *e. g., Marbury* v. *Madison*, 1 Cranch 137, 177; *Baker* v. *Carr*, 369 U.S. 186, 211. *United States v. Nixon*, 418 U.S. 683, 684 (1974)".

[128] McFarlane, Scott, "House January 6 committee refers contempt charges for Navarro and Scavino," *CBS News*, March 28, 2022. https://www.cbsnews.com/news/peter-navarro-dan-scavino-house-january-6-committee-refers-contempt-charge/

[129] See Immunity of the Assistant to the President, 38 Op. O.L.C. at *1; Letter for Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel at 1–2 (Aug. 1, 2007) ("Bradbury Letter"); Immunity of the Former Counsel, 31 Op. O.L.C. at 191; Reno Opinion, 23 Op. O.L.C. at 4; Immunity of the Counsel to the President from Compelled Congressional Testimony, 20 Op. O.L.C. 308, 308 (1996) ("Immunity of the Counsel to the President "); Letter for Jack Brooks, Chairman, Committee on the Judiciary, U.S. House of Representatives, from Nicholas E. Calio, Assistant to the President for Legislative Affairs at 1 (June 16, 1992) ("Calio Letter"); Olson Memorandum at 2; Memorandum for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, Re: Congressional Demand for Deposition of Counsel to the President Fred F. Fielding at 2 (July 23, 1982) ("Congressional Demand for Deposition of Counsel "); Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, Re: Congressional Testimony by Presidential Assistants at 1 (Apr. 14, 1981); Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, Re: Dual-Purpose Presidential Advisers at 5 (Aug. 11, 1977); Harmon Memorandum at 5; Letter to Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 25, 1974) (enclosing a memorandum, hereinafter "Scalia Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters at 6 (Dec. 21, 1972) ("Cramton Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee at 1 (Mar. 15, 1972) ("Erickson Memorandum"); Rehnquist Memorandum at 7.